No. 2022-2047

---

# In the United States Court of Appeals for the Federal Circuit

---

UATP IP, LLC, UATP Management, LLC,

*Plaintiffs-Appellees*,

v.

Kangaroo, LLC,

*Defendant-Appellant*,

Air Entertainment Group, LLC, Hai Chanh Quach, Dan Trinh, Raymond Hung, Edgar Alejandro Guerrero, Alan Trinh, Tina Luu, Golden Star Group, LTD.,

*Defendants*.

---

On Appeal from the United States District Court
for the Southern District of Texas

---

## BRIEF OF APPELLANT

---

CHAMBERLAIN, HRDLICKA, WHITE
WILLIAMS & AUGHTRY, P.C.

STEVEN J. KNIGHT
DAVID M. MEDINA
AMY JO FOREMAN
1200 Smith Street, Suite 1400
Houston, Texas 77002
(713) 654-9603

September 19, 2022

COUNSEL FOR KANGAROO, LLC

## LANGUAGE OF PATENT CLAIM

US 10,702,729 B2

**1**. A play apparatus comprising:

a) a first type of elevated equipment, the first elevated equipment having a first user safety support that extends for a first traverse, the first user safety support elevated above the ground level, the first user safety support configured to receive a safety harness worn by a user and allowing the safety harness to move with the user along the first traverse, the first elevated equipment having a first entry location for the user to enter the first elevated equipment and a first exit location for the user to exit the first elevated equipment;

b) a second type of elevated equipment, the second elevated equipment having a second user safety support that extends for a second traverse distance and that forms a closed loop, the second user safety support elevated above the ground level, the second user safety support configured to receive the safety harness worn by the user, the second user safety support allowing the safety harness to move with the user along the second traverse, the second elevated equipment having a second entry location for the user to enter the second elevated equipment and a second exit location for (the user to exit the second elevated equipment;

c) a common hub area comprising a platform that is elevated above the ground at a platform elevation, the common hub area including the first entry location, the second entry location and the second exit location, the first type of elevated equipment extending for the first traverse from the first entry location away from the common bub area and remaining to the common hub area at the first exit location. The second type of elevated equipment extending for the second traverse from the second entry location away from the common bub area and returning to the common hub area at the second exit location, at least one of the second entry location or the second exit location at the platform elevation, the other of the second entry location or the second exit location located at a different elevation than the platform elevation.

**2.** The play apparatus of claim **1** further comprising a third type of equipment located under the common hub area.

**3.** The play apparatus of claim **2** wherein the third type of equipment comprises an obstacle course.

**4.** The play apparatus of claim **2** wherein the third type of equipment has portions located above the common bub area.

**5.** The play apparatus of claim **1** wherein first entry location and the first exit location are one location.

**6.** The play apparatus of claim **1** further comprising a loading area, the loading area comprising an entry gate that allows entry to the second entry location and an exit gate that allows exiting from the second exit location.

**7.** The play apparan1s of claim **1** further comprising a third type of equipment located under the common hub area.

**8.** The play apparatus of claim **7** wherein the third type of equipment comprises an obstacle course.

**9.** The play apparatus of claim **7** wherein the third type of equipment has portions located above the common hub area.

**10.** The play apparatus of claim **1** wherein:

a) the first type of elevated equipment comprises a ropes course;

b) the second type of equipment comprises a zip coaster;

c) a loading area, the loading area comprising an entry gate that allows entry to the second entry location and an exit gate that allows exiting from the second exit location;

d) a third type of equipment located under the common hub area.

**11.** The play apparatus of claim **1** wherein the common hub area is elevated above the ground at a single platform elevation.

**12.** A play apparatus, comprising:

a) a first type of elevated equipment, the first elevated equipment having a first user safety support that extends for a first traverse, the first user safety support elevated above the ground level, the first user safety support configured to receive a safety harness worn by a user and allowing the safety harness to move with the user along the first traverse, the first elevated equipment having a first entry location for the user to enter the first elevated equipment and a first exit location for the user to exit the first elevated equipment:

b) a second type of elevated equipment, the second elevated equipment having a second user safety support that extends for a second traverse distance, the second user safety support elevated above the ground level, the second user safety support configured to receive the safety harness worn by the user, the second user safety support allowing the safety harness to move with the user along the second traverse, the second elevated equipment having a second entry location for the user to enter the second elevated equipment and a second exit location for the user to exit the second elevated equipment;

c) a common area elevated above the ground, the common area including the first entry location, the first exit location, the second entry location and the second exit location;

d) wherein the first type of elevated equipment is different to than the second type of elevated equipment;

e) wherein the second type of elevated equipment comprises a zip coaster;

f) the zip coaster further comprises a rail;
g) further comprising a control device located on the rail and moveable between blocking and open positions, wherein when the control device is in the blocking position, forward movement of a trolley on the rail past the control device is stopped and when the control device is in the open position, forward movement of the trolley past the control device is allowed.

# CERTIFICATE OF INTEREST

1. The full name of every entity represented in the case by the counsel filing the certificate.

   Kangaroo, LLC

2. For each entity, the name of every real party in interest, if that entity is not the real party in interest.

   N/A

3. For each entity, that entity's parent corporation(s) and every publicly held corporation that owns ten percent (10%) or more of its stock.

   N/A

4. The names of all law firms, partners, and associates that have not entered an appearance in the appeal, and (A) appeared for the entity in the lower tribunal; or (B) are expected to appear for the entity in this court.

   Gary Riebschlager
   THE RIEBSCHLAGER LAW FIRM

   Jason C. McLaurin
   Pamela Okafor
   MCLAURIN LAW, PLLC

5. Other than the originating case number(s), the title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

   N/A

6. All information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases.

   N/A

# TABLE OF CONTENTS

LANGUAGE OF PATENT CLAIM .......... ii

CERTIFICATE OF INTEREST .......... v

TABLE OF CONTENTS .......... vi

TABLE OF AUTHORITIES .......... viii

STATEMENT OF RELATED CASES .......... x

JURISDICTIONAL STATEMENT .......... xi

STATEMENT OF THE ISSUES .......... xii

STATEMENT OF THE CASE .......... 1

SUMMARY OF THE ARGUMENT .......... 12

STANDARD OF REVIEW .......... 13

ARGUMENT .......... 14

I. The district court abused its discretion in granting the preliminary injunction because UATP failed to establish that it is likely to succeed on the merits. .......... 14

A. UATP failed to establish that it is likely to succeed on its patent infringement claim .......... 14

B. UATP failed to establish that it is likely to succeed on its trade dress claim .......... 19

II. The district court abused its discretion in granting the preliminary injunction because UATP failed to establish irreparable harm. .......... 24

III. The district court abused its discretion in granting the preliminary injunction because it failed to consider the balance of equities and whether an injunction is in the public interest. .......... 27

IV. The district court abused its discretion because it granted the preliminary injunction without requiring UATP to post a bond as required by Rule 65(c)....27

CONCLUSION....28

ADDENDUM....29

CERTIFICATE OF COMPLIANCE....30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amazing Spaces, Inc. v. Metro Mini Storage*,
608 F.3d 225 (5th Cir. 2010) ....................22

*Beatriz Ball, LLC v. Barbagallo Co. LLC*,
40 F.4th 308 (5th Cir. 2022) ....................20, 22

*Boire Pilot v. Freight Carriers, Inc.*,
515 F.2d 1185 (5th Cir. 1975) ....................26

*Celgard, LLC v. LG Chem, Ltd*,
624 F. App'x 748 (Fed. Cir. 2015) ....................13, 27

*Chacon v. Granata*,
515 F.2d 922 (5th Cir. 1975) ....................24

*Chamberlain Group, Inc. v. Lear Corp.*,
516 F.3d 1331 (Fed. Cir. 2008) ....................15

*Citibank, N.A. v. Citytrust*,
756 F.2d 273 (2d Cir. 1985) ....................26

*Deerfield Medical Center v. City of Deerfield*,
661 F.2d 328 (5th Cir. 1981) ....................25

*Eppendorf-Netherler-Hinz GMBH v. Ritter GMBH*,
289 F.3d 351 (5th Cir. 2002) ....................20, 21

*Expedi, Inc. v. Rebound Int'l, LLC*,
No 4:20-CV-3897, 2021 WL 3702169 (S.D. Tex. May 14, 2021) ....................25

*Gonannies, Inc. v. Goaupair.com, Inc.*,
464 F. Supp. 2d 603 (N.D. Tex. 2006) ....................25

*Graco, Inc. v. Binks Mfg*,
60 F.3d 785 (Fed. Cir. 1995) ....................16, 18

*Holland America Ins. Co. v. Succession of Roy*,
777 F.2d 992 (5th Cir. 1985) ....................24

*Key Mfg. Group, Inc. v. Microdot, Inc.*,
925 F.2d 1444 (Fed. Cir. 1991) ........................................ 15

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) ........................................ 15

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*,
403 F.3d 1364 (Fed. Cir. 2005) ........................................ 16, 18

*Nutrition 21 v. United States*,
930 F.2d 867 (Fed. Cir. 1991) ........................................ 14, 26, 27

*Read Corp. v. Portec, Inc.*,
970 F.2d 816 (Fed. Cir. 1992) ........................................ 15

*Shuffle Master, Inc. v. VendingData Corp.*,
163 F. App'x 864 (Fed. Cir. 2005) ........................................ 15, 16, 18

*Sno-Wizard Mfg., Inc. v. Eisemann Products Co.*,
791 F.2d 423 (5th Cir. 1986) ........................................ 22

*Tinnus Enterprises, LLC v. Telebrands Corporation*,
846 F.3d 1190 (Fed. Cir. 2017) ........................................ 13, 14, 19

*Tough Traveler, Ltd. v. Outboard Prod.*,
60 F.3d 964 (2d Cir. 1995) ........................................ 26

*Viacom Int'l v. IJR Cap. Invs., LLC*,
891 F.3d 178 (5th Cir. 2018) ........................................ 21

*Wal-Mart Stores, Inc. v. Samara Bros.*,
529 U.S. 205 (2000) ........................................ 21

*Winder v. Natural Res. Def. Council, Inc.*,
129 S. Ct. 365 (2008) ........................................ 13

*Winter v. National Resources Defense Council*,
555 U.S. 7 (2008) ........................................ 24

**Other Authorities**

FED. R. CIV. P. 52(a) ........................................ 14, 27

FED. R. CIV. P. 65(c) ........................................ *passim*

## STATEMENT OF RELATED CASES

1. There has not been another appeal in or from the same civil action or proceeding in the lower court or body to this court or any other appellate court.

2. There are no other cases pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). The district court had jurisdiction over claims asserted under 35 U.S.C. § 1 *et seq*.; 17 U.S.C. § 1 *et seq*.; and 15 U.S.C. § 1051 *et seq*. The district court entered a preliminary injunction on June 28, 2022. Appx001. Appellant timely appealed on July 18, 2022. Appx824.

## STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion in granting the preliminary injunction where UATP failed to establish that it is likely to succeed on the merits of its patent infringement and trade dress infringement claims.

2. Whether the district court abused its discretion in granting the preliminary injunction where UATP failed to establish that it would suffer irreparable harm without the preliminary injunction.

3. Whether the district court abused its discretion in granting the preliminary injunction where it failed to consider the balance of equities and whether an injunction is in the public interest.

4. Whether the district court abused its discretion by granting the preliminary injunction against Kangaroo without requiring UATP to post a bond as required by Rule 65(c) of the Federal Rules of Civil Procedure.

## STATEMENT OF THE CASE

### *Introduction*

This is an interlocutory appeal from the granting of a preliminary injunction in favor of UATP IP, LLC ("UATP") and against Kangaroo, LLC ("Kangaroo") in a patent and trade dress infringement case. UATP owns and operates Urban Air Adventure Parks—indoor play facilities that include trampolines, zip-lining, a ropes course, and go-carts. Appx056. A goliath in the industry, UATP is a multimillion-dollar business with at least 160 facilities throughout the country. Appx058. Kangaroo, in stark contrast, is a family-owned, single-location business that operates a small play park in Laredo, Texas called Kangaroo Fun Zone. The preliminary injunction—supported by weak and insufficient evidence and no bond—threatens Kangaroo's existence. Kangaroo was forced to file this appeal.

### *UATP and Urban Air Adventure Parks*

UATP operates its nationwide adventure parks primarily through franchisees. Appx060, 058. To comply with UATP's franchise agreement, franchisees must follow the trade dress, and in doing so, must incorporate UATP's color scheme throughout all Urban Air park facilities. Appx084-85. As Stephen Polozola, UATP's chief legal officer, explained, UATP's color scheme consists of the colors orange and black. Appx086. Importantly, yellow is not a primary color that UATP uses in its facilities—it is only a secondary color. Appx086.

UATP also alleges it has—by way of an assignment—a patent (U.S. Patent No. 10,702,729, B2) on an attraction it calls "The Adventure Hub." Appx294, 463. "The Adventure Hub," according to UATP, "consists of 3 separate activities (zip-line activity called a 'Sky Rider' by Urban Air adventure Parks; a Ropes course; and a Soft Playground) which are combined in a unique and technical manner, so it becomes one continuous 'hub' of activity." Appx294, 463.

However, while the patent describes a ropes course and a zip-line, it says nothing about a "Soft Playground." Instead, the third feature is described as "an obstacle course." Appx513. Moreover, the claims in the patent do not describe "one continuous hub of activity." Instead, the claims describe "elevated equipment," "first user safety support," "a first traverse," "a second user safety support," "a second traverse," "a closed loop," "a control device," and "a common area hub." Many phrases in the patent, including "common hub area"—which UATP claims to be the essence of the patent—are not defined, establishing the need for a claim construction (more on this later). Appx513.

UATP was assigned the *provisional* patent application on March 21, 2017. Appx535, 367. The actual patent contains new structural designs that were not described in the assigned provisional patent application. *See* Appx453-54. Consequently, UATP has no patent interest in those new structural designs.

### *UATP and AEG*

In 2016, UATP entered into a franchise agreement with Air Entertainment Group, LLC. Appx464-65. The members of AEG are Hai Quach, Dan Trinh, Raymond Hung, and Alan Trinh. Doc. Appx062-63. AEG operated an Urban Air park in a building owned by Golden Star Group, Ltd. and located at 6310 McPherson Road in Laredo, Texas. Appx462. This was the only Urban Air park in Laredo, Texas. Appx175.

On January 20, 2021, UATP terminated its franchise agreement with AEG for failure to pay business royalties and abandonment of the premises. Appx296. AEG offered that UATP assume AEG's lease and its equipment that AEG kept on the property, but UATP took over neither. Appx066-67. Upon termination of the franchise agreement, Golden Star sold the building, with the equipment inside, to Tina Luu. Appx068, 147.

### *Kangaroo*

On July 1, 2021, Ms. Luu, as the sole owner of the property and the equipment inside, began leasing the property to Kangaroo. Appx147. Kangaroo, a small, single location, family-owned company, began using the equipment to operate its Kangaroo Fun Zone. Minh Tang is the sole owner of Kangaroo. Appx111. There is no common ownership between Kangaroo and AEG. *Compare* Appx062-63 *with* Appx111. Stanley Tang is the son of the owner and oversees the finances and high

level details of Kangaroo Fun Zone. Appx154. Kangaroo never entered into an agreement with UATP, and it had no knowledge of UATP's trade dress and patent before the filing of this lawsuit. Appx111.

At the end of July 2021, UATP inspected Kangaroo Fun Zone. Appx066. UATP claims that its inspection raised concerns of patent and trade dress infringement. Appx066.

***The Lawsuit and Changes to Kangaroo***

UATP filed this lawsuit on July 30, 2021, alleging Kangaroo's use of the equipment violates certain intellectual property rights belonging to UATP (patent, copyright, and trade dress infringement).[1] Appx212. In its answer to UATP's complaint, Kangaroo denied, among other things, that it has infringed any valid and enforceable claim of the patent. Appx413.

Once Kangaroo learned of UATP's claims, it contacted UATP to get clarification on UATP's patent and trade dress, but Kangaroo did not receive any guidance from UATP. Appx114. Despite UATP's refusal to help Kangaroo mitigate the alleged imminent and irreparable harm UATP claims it suffered, Kangaroo began making substantial modifications to its park. Appx114.

---

[1] Kangaroo filed a motion to dismiss the lawsuit on the grounds that UATP does not have standing to enforce the patent because it describes structural designs that were not described in the provisional patent application UATP acquired via the assignment. Appx358. The district court recognized that the patent added new structural designs that were not included in the provisional patent application, establishing a fact issue as to UATP's rights to the patent. *See* Appx453-54.

Specifically, the soft playground, ropes course, and zip-line, which used to be connected, are now completely separated. Appx116. Additionally, Kangaroo built a staircase and entrance that leads just to the ropes course. Appx116. The three attractions have no central hub and can only be accessed by their own individual entrances. Appx116. Kangaroo also built walls separating the three attractions. Appx116.

As a result of Kangaroo's substantial modifications, there is not "one continuous hub of activity"—the defining characteristic of the patent, according to UATP. Kangaroo also made significant changes to other aspects of the park, including, but not limited to, the change in the color scheme. Appx117. Kangaroo removed and replaced significant amounts of blue and green equipment and repainted several walls. Appx117; *see also* Appx836.

Unfortunately, UATP was unsatisfied with these changes and seemed more intent on forcing Kangaroo to close shop. Eleven months after UATP's claims arose through the inspection of Kangaroo's park, UATP belatedly filed briefing in support of its request for a preliminary injunction and requested a hearing. Appx610.

Kangaroo timely responded to UATP's brief. Appx712. Kangaroo described the extensive changes to the look and feel of the park, including changes to the color scheme, the addition of art work, and changes to the hub, distinguishing it from UATP's claimed patent. Appx702-711. Additionally, Kangaroo questioned the

legitimacy of UATP's claimed patent in light of the fact that the patent includes new subject matters that were not described in the provisional patent application—issues the district court previously determined to raise questions of fact. Appx708, 453-54.

***The Hearing***

The Court conducted an evidentiary hearing on June 24, 2022, on UATP's request for a preliminary injunction. Appx043. At the hearing, UATP presented as its witness Stephen Polozola, UATP's chief legal officer, and Kangaroo presented Stanley Tang, the son of the owner of Kangaroo Fun Zone. Mr. Polozola testified that he learned of Kangaroo Fun Zone the same month it opened, in July 2021. Appx066. He testified that he conducted a walkthrough of the facility in that same month, approximately eleven months before the hearing. Appx066.

Mr. Polozola further testified about the trade dress that Kangaroo allegedly infringed upon, necessitating UATP's request for a preliminary injunction. When Mr. Polozola was asked which colors constitute UATP's color scheme, he testified, "orange and black, without question." Appx086. He listed no other colors as part of UATP's trade dress. He made no mention of the colors "Urban Air Lime Green" or "Cosmic Dust Blue." And, he testified yellow is only "kind of a secondary color" that UATP uses. Appx086.

Mr. Polozola also testified regarding "The Adventure Hub," the subject of UATP's alleged patent. He admitted it is not the existence of the attractions

individually that creates the patented characteristic of "The Adventure Hub," as other trampoline parks can have a soft playground, or a ropes course, or a zip-line. In fact, Mr. Polozola compared UATP's "Soft Playground" to a McDonald's playground. Appx073.

He clarified that the "The Adventure Hub" is patented specifically for the integration of the three attractions into one attraction. Appx073. This testimony is consistent with UATP's Second Amended Complaint, which describes the alleged patented attraction as "one continuous 'hub' of activity." Appx463. Mr. Polozola additionally admitted UATP was able to make tweaks on its own ropes course, so that it is technically not violating other patents on ropes courses. Appx091-92.

Mr. Polozola's testimony concerning the patent spanned just five pages, and what he did not say was far more enlightening than anything he did say. *See* Appx073-77. He did not explain how Kangaroo Fun Zone park that includes an allegedly infringing "Soft Playground" as a third feature could infringe on UATP's patent, which describes the third feature of "The Adventure Hub" as an "obstacle course," not a "Soft Playground." Appx513. He did not provide any testimony to aid the court's claim construction, which is necessary to gauge whether UATP is likely to succeed on the merits of its patent infringement claim. Further, there was no discussion of the meaning of any of the patent's complex language used to describe the claimed invention, including "elevated equipment," "first user safety support,"

"a first traverse," "a second user safety support," "a second traverse," "a closed loop," "control device," and, most importantly, "common hub area." He not only failed to discuss these phrases, but he offered no testimony concerning how Kangaroo's equipment—which lacks a common hub—infringed.

When questioned by UATP's own counsel about UATP's eleven month delay in seeking a hearing on its request for a preliminary injunction, Mr. Polozola cited discovery issues. Appx102. Specifically, UATP claims it was waiting for Kangaroo to produce documents before it could move forward on seeking a preliminary injunction. Appx102. Mr. Polozola failed to explain how Kangaroo's production of documents impacted UATP's ability to seek an injunction. More importantly, UATP's testimony at the hearing was devoid of any justification for its delay in seeking relief on a claim it alleges would cause imminent and irreparable harm.

Stanley Tang testified on behalf of Kangaroo. Mr. Tang testified Kangaroo does not want to be associated with UATP. Appx114. Kangaroo is located in Laredo, Texas. Appx114. The closest UATP location to Kangaroo is in San Antonio, Texas, which is several hours away. Appx115. Despite the lack of competition, he testified that once he learned of UATP's complaints against Kangaroo, he reached out to UATP to learn about the patent and the trade dress. Appx114. However, UATP did not cooperate. Appx114.

Mr. Tang testified that Kangaroo made significant changes to the color scheme of its park, including creating and displaying its own artwork and repainting the walls. Appx117. Mr. Tang further testified Kangaroo disjoined the soft playground, ropes course, and zip-line, so that they are three completely separate attractions. Appx116. In fact, Kangaroo built walls around each attraction, and even built a separate stairway entrance for the ropes course. Appx116. Mr. Tang confirmed that the hub connecting the three attractions to each other that Mr. Polozola described in his direct examination does not exist at Kangaroo. Appx116. Just like UATP made changes to distinguish its ropes course from other patented ropes courses, Kangaroo—out of an abundance of caution—made changes to distinguish its attractions from UATP's "Adventure Hub." Appx091-92.

After the presentation of the witnesses, Kangaroo's counsel argued that the court should deny UATP's request for a preliminary injunction—an extraordinary remedy—because (i) this is a case of alleged monetary damages; (ii) the preliminary injunction sought by UATP would effectively shut down Kangaroo; (iii) UATP failed to show it would be irreparably harmed without a preliminary injunction, as evidenced by its eleven month delay in pursuing relief; and (iv) UATP did not balance the hardships or address the public interest factor—additional essential elements UATP failed to establish. Appx175-77.

In response to Kangaroo, the court seemingly acknowledged that an injunction is not needed. "Well, monetary damages might be adequate, but waiting before making sure the right parties are here, and the unright parties are out, because sometimes by the time you reach the party who owes you the money, then they have shipped it all to Montana or something." Appx178. The court assured the parties it does not want to shut down Kangaroo's operations because putting Kangaroo out of business would be unnecessary and brutal. Appx183. The court's preliminary injunction, however, threatens exactly that.

***The Preliminary Injunction***

On June 28, 2022, the trial court entered a two and one-half page preliminary injunction, ordering as follows:

> 3. *Injunction.*
>
> The court does not seek to close Kangaroo's operations. It will balance the harm to protect Urban Air interests before an expedited trial.
>
> Kangaroo is enjoined from using neon orange, yellow, Urban Air Lime Green, and Cosmic Dust Blue in its facility or on social media, waivers, and advertisements. It must also cease operations of the Adventure Hub from the trampoline park and stop the use of Urban Air's confidential information.
>
> Signed on June 28, 2022, at Houston, Texas.

Appx001-3.

In granting UATP this relief, the court: (i) failed to address all of the elements UATP was required to prove to secure injunctive relief; (ii) determined UATP was likely to succeed on the merits of its patent infringement claim without performing a claim construction and by disregarding sworn and unrefuted testimony that Kangaroo Fun Zone does not contain a "common area hub"; (iii) determined UATP is likely to succeed on its trade dress claim despite UATP's failure to prove its unregistered trade dress acquired secondary meaning and despite the court's implicit finding UATP's evidence "do[es] not necessarily imply confusion"; (iv) restricted Kangaroo from using an expansive list of common colors; and (v) failed to require UATP to post a bond as mandated by Rule 65(c) of the Federal Rules of Civil Procedure.

After the court entered the preliminary injunction, Kangaroo filed its notice of appeal, but continued making changes to the interior of the building to comply with the injunction to the extent it is able. Appx824, 836-51. After doing so, it asked the court to modify the injunction in part to alleviate it from having to remove building fixtures that display the forbidden common colors due to the substantial burden involved. Appx826. That motion is still under review.

## SUMMARY OF THE ARGUMENT

The district court abused its discretion in granting the preliminary injunction, and this Court should reverse for at least five reasons. First, the court erred in finding that UATP is likely to succeed on its patent infringement claim because (i) it failed to perform a claim construction, which deprives this Court of meaningful appellate review; and (ii) it ignored sworn and unrefuted testimony that Kangaroo dismantled anything that could allegedly resemble a "hub," which UATP claims to be the patented feature of its play equipment.

Second, the court erred in finding that UATP is likely to succeed on its trade dress claim because (i) it determined that UATP has a protectable trade dress interest in equipment that is purely functional; (ii) it did not find that UATP's (unregistered) trade dress acquired secondary meaning, and UATP offered no evidence that it did; (iii) it did not find that there is a likelihood of confusion; it found the opposite; and (iv) it forbade Kangaroo from using an expansive list of common colors, ignoring UATP's admission that the primary color scheme of the Urban Air parks is orange and black.

Third, the court determined that UATP would suffer "harm" in the absence of a preliminary injunction, but it failed to find—and no evidence supports—that UATP would suffer *irreparable* harm. Moreover, the court ignored case law holding that irreparable harm is not established when the movant delays seeking injunctive

relief. Here, UATP's delay of nearly one year is extreme. It disqualifies UATP from obtaining the extraordinary remedy of a preliminary injunction.

Fourth, the district court erred because it failed to consider, and it made no findings concerning, the balance of equities and whether an injunction is in the public interest. And fifth, the court failed to require UATP to post a bond, which is required under Rule 65(c) of the Federal Rules of Civil Procedure. For these reasons and for the additional reasons set forth below, Kangaroo respectfully requests the Court to reverse the preliminary injunction.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winder v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008). The party seeking a preliminary injunction must establish that (i) he is likely to succeed on the merits, (ii) he is likely to suffer irreparable harm in the absence of preliminary relief, (iii) the balance of equities tip in his favor, and (iv) an injunction is in the public interest. *Celgard, LLC v. LG Chem, Ltd*, 624 F. App'x 748, 752 (Fed. Cir. 2015).

"Both the Fifth Circuit and the Federal Circuit review preliminary injunctions for an abuse of discretion." *Tinnus Enterprises, LLC v. Telebrands Corporation*, 846 F.3d 1190, 1203 (Fed. Cir. 2017). "A party can establish an abuse of discretion in the preliminary injunction context by showing that the court made a clear error of

judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings." *Id.* (citing *Abbott Labs v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1335 (Fed. Cir. 2006)).

"A district court is specifically required to make findings of fact on which it relies to justify granting a preliminary injunction under FED. R. CIV. P. 52(a)." *Nutrition 21 v. United States*, 930 F.2d 867, 869 (Fed. Cir. 1991). "Sufficient factual findings on the material issues are necessary to allow this court to have a basis for meaningful review." *Id.*

## ARGUMENT

### I. The district court abused its discretion in granting the preliminary injunction because UATP failed to establish that it is likely to succeed on the merits.

In granting the preliminary injunction, the district court found UATP is likely to succeed on just two of its causes of action—its patent infringement claim and its trade dress claim. The court abused its discretion, however, because the record does not support its findings.

#### A. UATP failed to establish that it is likely to succeed on its patent infringement claim

In determining that UATP is likely to succeed on its patent infringement claim, the court erred in two critical respects. First, it failed to perform a claim construction to enable it to determine whether Kangaroo's equipment runs afoul of the patent, which is reversible error. Second, the court ignored sworn and unrefuted

testimony that Kangaroo dismantled anything that allegedly resembled a "hub" from its equipment, which also constitutes reversible error.

With respect to the former, "[t]he determination of infringement is a two-step process. First, the language of the claim must be interpreted. Second the accused device must be compared to the claim language as interpreted." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821 (Fed. Cir. 1992). The first step, claim construction, is a matter of law exclusively for the court. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995).

When a party disputes that it has violated a claim described in a patent, claim construction is required, particularly at the preliminary injunction phase of the case. As this Court explained: "A preliminary injunction requires analysis of the likelihood of success on the merits. This factor, in turn, depends fundamentally on the meaning of the asserted claim and its relationship to the accused product. Therefore, a correct claim construction is almost always a prerequisite for imposition of a preliminary injunction." *Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1339-40 (Fed. Cir. 2008); *see also Shuffle Master, Inc. v. VendingData Corp.*, 163 F. App'x 864, 868 (Fed. Cir. 2005) ("[T]he court must give the claim construction issue the attention necessary to determine the likelihood of success."); *Key Mfg. Group, Inc. v. Microdot, Inc.*, 925 F.2d 1444, 1448 (Fed. Cir. 1991) ("Before analyzing a claim to determine whether infringement occurs, the court must properly

interpret the claim.”).

When a district court fails to perform a claim construction, it deprives the court of appeals of meaningful appellate review, necessitating reversal. *See Graco, Inc. v. Binks Mfg*, 60 F.3d 785, 791 (Fed. Cir. 1995) (“The entire omission of a claim construction analysis from the opinion, and the conclusory factual findings on infringement, each provide an independent basis for remand.”); *see also Shuffle Master*, 163 F. App’x at 868 (vacating a preliminary injunction because “in the absence of any claim construction by the district court we cannot accept Shuffle Master’s argument . . . that [it] is likely to succeed on the merits.”); *Nazomi Commc’ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1371 (Fed. Cir. 2005) (reversing summary judgment ruling and explaining, “This court must be furnished sufficient findings and reasoning to permit meaningful appellate scrutiny. This requirement for sufficient reasoning applies with equal force to issues of law, such as claim construction, and issues of fact, such as infringement.”).

Here, UATP alleges Kangaroo infringed on U.S. Patent No. 10,702,729, B2, pertaining to the “The Adventure Hub.” The patented technology, according to UATP, is the combination of the zip-line, ropes course, and a “Soft Playground” (unmentioned in the patent), which UATP says are “combined in a unique and technical manner so it becomes one continuous ‘hub’ of activity.” Appx463. UATP’s patent infringement claim is dubious.

The claims in the patent say nothing about a "Soft Playground"; the third attraction is an obstacle course. Further, the claims in the patent do not describe "one continuous hub of activity." Instead, the claims describe such technical requirements as "elevated equipment," "first user safety support," "a first traverse," "a second user safety support," "a second traverse," "a closed loop," "control device," and, importantly, "a common area hub"—which UATP emphasizes. However, Kangaroo disputes that its equipment includes any patented technology, including a "common area hub"—an ambiguous phrase the patent leaves undefined. Plainly, whether UATP is likely to succeed on its patent infringement claim turns on the contested issue of claim construction, particularly the meaning of "common area hub."

And yet, in finding that UATP was likely to succeed on its patent infringement claim, the district court failed to analyze or interpret the meaning of "common area hub," or any other technical terms included in the claim section of the Patent. Rather, the court's likelihood of success analysis is reduced to the following four short, conclusory, and erroneous sentences:

> Urban Air claims that Kangaroo infringed on its patent for play equipment, which it calls the Adventure Hub. Kangaroo says that it has disjoined the Adventure Hub through barriers. It did not have sufficient evidence at the hearing to show how it eliminated the patented characteristic. It did not have pictures of how it has separated the equipment to make it distinctive from the patent.

Appx002. That's the extent of the court's reasoning. And it's insufficient—legally

and factually.

Legally, it is insufficient because the court did not perform a claim construction. It did not describe "the patented characteristics." It did not explain the meaning of "elevated equipment," "first user safety support," "a first traverse," "a second user safety support," "a second traverse," "a closed loop," "control device," and, most importantly, "common area hub." Because the district court neglected to construe, analyze, or explain any of these phrases, this Court has no meaningful opportunity to assess whether the district court properly concluded that UATP is likely to succeed on its patent infringement claim. Without a claim construction, reversal is required. *See Graco, Inc.*, 60 F.3d at 791; *Shuffle Master*, 163 F. App'x at 868; *Arm Holdings*, 403 F.3d at 1371.

Factually, the court erred because Kangaroo offered sworn and unrefuted testimony that it created barriers, separating the three attractions. The court's determination that Kangaroo failed to offer "sufficient evidence" that it eliminated the alleged hub from its play features is flatly wrong. Mr. Tang testified as follows:

Q. All right. Did Kangaroo make changes to this thing called "The Hub"?

A. Yes, Kangaroo has.

Q. Can you tell the Court what changes Kangaroo has made to The Hub?

A. Yes. So The Hub has been changed as in now it used to be enjoined and connected, but now it's <u>completely separate</u>. We built a separate

stairway to the ropes course with a separate entrance to get in. So the attractions are no longer linked to Adventure Hub. It does not exist anymore.

Q. Did you build walls to segregate the attraction on The Hub?

A. Yes, we have – we have built walls to completely wall off the different attractions.

Appx115-16 (emphasis added).

Importantly, UATP's counsel had the opportunity to question Mr. Tang about these structural changes and the removal of the alleged hub, but he chose to avoid this topic on cross-examination. On this record, it is undisputed that Kangaroo dismantled the alleged hub. In finding Kangaroo offered insufficient evidence, the district court committed an error of law and made clearly erroneous factual findings. The court abused its discretion, and the preliminary injunction order must be reversed. *See Tinnus Enterprises*, 846 F.3d at 1203.

### B. UATP failed to establish that it is likely to succeed on its trade dress claim.

In determining that UATP is likely to succeed on its trade dress claim, the court again erred in several respects. First, it found that UATP has a trade dress interest in equipment that is purely functional. Second, it did not find UATP's (unregistered) trade dress acquired secondary meaning, and UATP offered no evidence that it did. Third, it did not find that there is a likelihood of confusion; it

found the opposite. And fourth, it forbade Kangaroo from using an expansive list of common colors, ignoring UATP's admission that the primary color scheme of the Urban Air parks is orange and black.

"'Trade dress' refers to the design or packaging of a product which serves to identify the product's source." *Eppendorf-Netherler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 354-55 (5th Cir. 2002). "The purpose of trade dress protection, like trademark protection, is to secure the owner of the trade dress the goodwill of his business and to protect the ability of consumers to distinguish among competing products." *Id*. at 355. "Trade dress protection, however, is not intended to create patent-like rights in innovative aspects of product design." *Id*. "Trade dress protection, unlike patent law, does not foster innovation by preventing reverse engineering or copying of innovative product design features." *Id*. UATP's trade dress claims fail because it claims "trade dress" for functional items, it offered no evidence of secondary meaning, and it has not demonstrated a likelihood of confusion.

To be likely to prevail on a trade dress claim, the plaintiff "must prove that: (1) its trade dress qualifies for protection; and (2) the trade dress has been infringed by demonstrating a likelihood of confusion in the minds of potential consumers." *Beatriz Ball, LLC v. Barbagallo Co. LLC*, 40 F.4th 308, 318 (5th Cir. 2022).

Trade dress protection does not extend to matters that are functional. *Ritter*

*GMBH*, 289 F.3d at 355. "The requirement of non-functionality prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Id*. "Protection of functional product features is the province of patent law, which confers a monopoly over new product designs for a limited time only, after which competitors are free to copy at will." *Id*. "It is clear that functional product features do not qualify for trade dress protection." *Id.*

Further, "[i]n an action for infringement of unregistered trade dress . . . a product's design is distinctive, and therefore protectable only upon a showing of secondary meaning." *Wal-Mart Stores, Inc. v. Samara Bros*., 529 U.S. 205, 216 (2000). Secondary meaning is established when, "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Id.* at 211. Importantly, a plaintiff's "burden of demonstrating secondary meaning is substantial and requires a high degree of proof." *Viacom Int'l v. IJR Cap. Invs., LLC*, 891 F.3d 178, 190 (5th Cir. 2018).

Seven factors must be considered in determining whether a plaintiff's purported claim dress acquired secondary meaning. They are: (1) the length and manner of use of the trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of the use of the trade dress in newspapers and magazines, (5) consumer survey evidence, (6) direct consumer testimony, and (7) the defendant's

intent in copying the trade dress. *See Beatriz Ball*, 40 F.4th at 317. "Because the primary element of secondary meaning is a mental association in buyers' minds between the alleged mark and a single source of the product, the determination whether a mark or dress has acquired secondary meaning is primarily an empirical inquiry." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236 (5th Cir. 2010).

Finally, with respect to the likelihood of confusion element, courts consider "a variety of factors, including, but not limited to: similarity of products, identity of retail outlets and purchasers, identity of advertising media, type (*i.e.*, strength) of trademark or trade dress, defendant's intent, similarity of design, and actual confusion." *Sno-Wizard Mfg., Inc. v. Eisemann Products Co.*, 791 F.2d 423, 428 (5th Cir. 1986).

In finding that UATP is likely to succeed on its trade dress claim, the district court reasoned that UATP "has shown that Kangaroo substantially imitated Urban Air's total image by using the same colors, attraction structures, and park layout." Appx002. But substantial imitation—which Kangaroo denied—is not the standard. The standard asks if the consuming public is likely to be confused, and the court answered that question against UAB. The court wrote: "Questions by customers about the new trampoline park that suggest similarities between Urban Air and Kangaroo *do not necessarily imply confusion*." Appx003 (emphasis added).

The court also failed to conduct any analysis of whether UATP's unregistered trade dress qualifies for protection. It does not. According to the court, UATP had a protected trade dress in "attraction structures." But attraction structures are functional and do not qualify for protection regardless of their color. Further, because UATP did not register its trade dress, it would only qualify for protection if it acquired secondary meaning—an inherently empirical analysis.

UATP's burden is substantial and it had to offer a high degree of proof. But UATP offered no evidence of the seven factors courts review in answering the secondary meaning question. And, because UATP offered no evidence, the court made no finding that UATP's trade dress acquired secondary meaning. With no secondary meaning evidence and with no secondary meaning finding, it cannot be said that UATP's trade dress qualifies for protection. And without qualification, it cannot be said that UATP is likely to succeed on its trade dress infringement claim. In finding otherwise, the court committed plain judicial error.

Additionally, as noted the court failed to analyze whether there is a likelihood of consumer confusion. The court did not address any of the pertinent factors, such as the similarity of products, identity of retail outlets and purchasers, identity of advertising media, type (*i.e.*, strength) of trademark or trade dress, defendant's intent, similarity of design, and actual confusion. Instead, on this record, the court found there is not even an inference or implication of confusion. *See* Appx003

("Questions by consumers about the new trampoline park that suggest similarities between Urban Air and Kangaroo *do not necessarily imply confusion*.") (emphasis added). Having ruled out confusion, UATP is unlikely to succeed on its claim.

Lastly, the court abused its discretion by forbidding Kangaroo from using common and ordinary colors, such as yellow, green, and blue. UATP testified only orange and black, "without question," are its signature colors. Appx086. It is unclear why the court enjoined Kangaroo from using a broad range of ordinary colors that are common to play parks when UATP provided no testimony at the hearing establishing those colors as part of UATP's color scheme. The preliminary injunction overreaches.

## II. The district court abused its discretion in granting the preliminary injunction because UATP failed to establish irreparable harm.

The district court determined that UATP is likely to suffer irreparable harm in the absence of preliminary relief because it presented evidence of harm "through side-by-side photos demonstrating similarities." Appx003. Mere evidence of some similarities, however, is not sufficient to establish irreparable harm.

"An injunction is appropriate only if the anticipated injury is imminent and irreparable." *Chacon v. Granata*, 515 F.2d 922, 926 (5th Cir. 1975). Speculative harm or mere possibility of irreparable harm is not sufficient. *Winter v. National Resources Defense Council*, 555 U.S. 7, 22 (2008); *see also Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 996 (5th Cir. 1985). Rather, irreparable harm

is a harm that cannot be remedied by monetary damages. *Deerfield Medical Center v. City of Deerfield*, 661 F.2d 328, 338 (5th Cir. 1981).

"Irreparable harm requires a showing that: (1) the harm to Plaintiffs is imminent (2) the injury would be irreparable and (3) that Plaintiffs have no other adequate legal remedy." *Gonannies, Inc. v. Goaupair.com, Inc.*, 464 F. Supp. 2d 603, 608 (N.D. Tex. 2006) (citing *Chacon*, 515 F.2d at 925). It is well established that:

> Delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief. Evidence of an undue delay in bringing a suit may be sufficient to rebut the presumption of irreparable harm.

*Id*. at 609. "This is because the concept of 'irreparable harm' includes that the harm is imminent, and therefore must be remedied faster than a trial on the merits would allow." *Expedi, Inc. v. Rebound Int'l, LLC*, No 4:20-CV-3897, 2021 WL 3702169 (S.D. Tex. May 14, 2021).

A plaintiff who delays for months before seeking a preliminary injunction cannot establish irreparable harm. *See id.* (denying injunctive relief because "[a]lthough Plaintiffs first learned of the alleged infringing conduct on March 1, 2006, and filed this action on April 7, 2006, they nonetheless did not file the present motion seeking injunctive relief until September 15, 2006, and only after settlement

negotiations had soured."); *see also Boire Pilot v. Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming denial of a preliminary injunction where the movant delayed three months); *Nutrition 21 v. United States*, 930 F.2d 867, 872 (Fed. Cir. 1991) ("[T]hat Nutrition 21 delayed for a substantial period of time before seeking a preliminary injunction at least suggests that the status quo does not irreparably damage Nutrition 21."); *Tough Traveler, Ltd. v. Outboard Prod.*, 60 F.3d 964, 968 (2d Cir. 1995) (vacating preliminary injunction based on four month delay); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (ten week delay undercut claim of irreparable harm).

Here, UATP claims it discovered the alleged violations in July 2021. Although it filed its lawsuit later that month, it did not pursue a preliminary injunction until June 9, 2022, nearly a year after becoming aware of the alleged violations. UATP was content with the status quo. Its extreme delay conclusively demonstrates there was no threat of imminent or irreparable harm. The district court failed to apply the law correctly; UATP's extreme delay disqualifies it from obtaining the extraordinary remedy of a preliminary injunction.

Moreover, in granting the preliminary injunction, the district court found only that UATP "was harmed." It made no finding that UATP would be *irreparably* harmed without the preliminary injunction. And it would not be. In this case, assuming UATP can meet its burden a proof, which Kangaroo disputes, money

damages can compensate the company for any alleged harm. The district court acknowledged as much at the hearing. See Appx178 ("money damages might be adequate."). Nothing in the preliminary injunction modified this finding. This renders a preliminary injunction wholly improper.

## III. The district court abused its discretion in granting the preliminary injunction because it failed to consider the balance of equities and whether an injunction is in the public interest.

In addition to proving likely success on the merits and irreparable harm, the party seeking a preliminary injunction must prove that the balance of equities tip in its favor and an injunction is in the public interest. *Celgard,* 624 F. App'x at 752. The district court abused its discretion because it failed to consider or analyze these factors. While the court stated "[i]t will balance the harm," nothing in the preliminary injunction reveals how harm was balanced. As this court holds, "[a] district court is specifically required to make findings of fact on which it relies to justify granting a preliminary injunction under FED. R. CIV. P. 52(a)." *Nutrition 21*, 930 F.2d at 869. Because the court failed to do so, the preliminary injunction must be reversed.

## IV. The district court abused its discretion because it granted the preliminary injunction without requiring UATP to post a bond as required by Rule 65(c).

Rule 65(c) states: "the court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or

restrained." FED. R. CIV. P. 65(c). The district court erroneously failed to require UATP to post a bond.

## CONCLUSION

Kangaroo, LLC requests the Court to reverse the preliminary injunction order and to grant any additional relief to which it is entitled at law or in equity.

Dated: September 19, 2022

Respectfully submitted,

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY

By: *\/s/ Steven J. Knight*
STEVEN J. KNIGHT
DAVID M. MEDINA
AMY JO FOREMAN
1200 Smith Street, Suite 1400
Houston, Texas 77002
(713) 654-9603

**ADDENDUM**

| Addendum | Description | Filing Date | Pages |
|---|---|---|---|
| A. | Certificate of Compliance | | 30 (of Brief) |
| B. | Preliminary Injunction | 06/28/22 | Appx001-003 |
| C. | Patent No. US 10,702,729 B2 | 20/06/21 | Appx021-042 |

## ADDENDUM A

## CERTIFICATE OF COMPLIANCE

I, Steven J. Knight, hereby certify that the foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally-spaced typeface and includes 6,185 words.

Dated: September 19, 2022

By: *\/s/ Steven J. Knight*

STEVEN J. KNIGHT
CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY
1200 Smith Street, Suite 1400
Houston, Texas 77002
(713) 654-9603

**Addendum B**



UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF TEXAS

United States District Court
Southern District of Texas
**ENTERED**
June 28, 2022
Nathan Ochsner, Clerk

UATP IP, LLC, *et al.*, §
§
Plaintiff, §
§
*versus* § Civil Action H-21-2478
§
Kangaroo, LLC, *et al.*, §
§
Defendants. §

# Preliminary Injunction

1. *Background.*

UATP IP, LLC, (Urban Air) seeks to enjoin Kangaroo, LLC, from using its patent, registered copyright, color scheme, confidential information, and photographs at its trampoline park.

Urban Air entered a franchise with Air Entertainment Group, LLC, to operate a Urban Air Adventure Park. Urban Air terminated the franchise when Air Entertainment Group did not pay the fee required under the license. The same owners of the Group created Kangaroo and leased the premises to operate a similar indoor trampoline park. Urban Air says Kangaroo infringed on its registered patent and copyright. It sued.

2. *Preliminary Injunction.*

For a preliminary injunction, Urban Air must show:

(a) a substantial likelihood of success on the merits;

(b) a substantial threat of irreparable harm if the injunction is denied;

(c) that the threatened injury if the injunction is denied outweighs harm that might result if the injunction is granted; and

(d) that the grant of an injunction is in the public's interest.[1]

---

[1] *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

A. *Likelihood of Success.*

Urban Air claims that Kangaroo infringed on its patent for play equipment, which it calls the Adventure Hub. Kangaroo says that it has disjoined the Adventure Hub through barriers.

It did not have sufficient evidence at the hearing to show how it eliminated the patented characteristic. It did not have pictures of how it has separated the equipment to make it distinctive from the patent.

The underlying issue of the patent assignment of the adventure hub remains in dispute. This court said in its May 24, 2022 Opinion on Partial Dismissal that the patent's assignment and scope of new matter is a factual issue. At this stage, Urban Air likely owns patent the patent based on the assignment agreement. The agreement in the transfer of ownership said that the entire right, title, and interest in the invention is assigned to Urban Air. It is likely to succeed.

Urban Air also claims Kangaroo infringed on its trade dress rights by using its signature colors, graphics, play equipment and layout, and signs. Kangaroo says Urban Air did not plead its trade dress claims against it with the required specificity.

At the preliminary injunction hearing, Urban Air showed that Kangaroo is using its signature colors, safety warnings, and park layout and attractions. Kangaroo's witness testified at the preliminary injunction that he posted a statement on social media that alluded to the similarities between Urban Air and Kangaroo.

Urban Air's trade dress claim against Kangaroo is likely to succeed on the merits, because it has shown that Kangaroo substantially imitated Urban Air's total image by using the same colors, attraction structures, and park layout.

B. *Irreparable Harm.*

Urban Air claims it has and will continue to suffer irreparable harm, because Kangaroo has created a likelihood that its customers will confuse Kangaroo with Urban Air. It waited to file a preliminary injunction because it says that Kangaroo stopped complying with discovery requests. Kangaroo says

that Urban Air waited 11 months before moving for an injunction. It says that the harm is not irreparable.

Plaintiffs seeking an injunction to prevent a trade violation under the Lanham Act are entitled to a "rebuttable" presumption of irreparable harm if a violation exists.[2] Urban Air has substantial evidence that it was harmed through side-by-side photos demonstrating similarities. In the hearing, Kangaroo used evidence of plastered photos from unverified sources on the internet to show that Urban Air is ordinary. It is insufficient rebut the presumption.

The parties cooperated to have site visits to cure the trade dress. When Kangaroo stopped working with Urban Air, it became necessary to file a preliminary injunction.

Urban Air's exhibits show that the trampoline park is plastered with posters depicting fuzzy animals, flowers, and the word "Kangaroo." It also provides social media posts of customers asking whether Kangaroo is in the same location and provides similar membership pricing.

Questions by customers about the new trampoline park that suggest similarities between Urban Air and Kangaroo do not necessarily imply confusion. It does, however, evince similarities that harm Urban Air.

3. *Injunction.*

The court does not seek to close Kangaroo's operations. It will balance the harm to protect Urban Air interests before an expedited trial.

Kangaroo is enjoined from using neon orange, yellow, Urban Air Lime Green, and Cosmic Dust Blue in its facility or on social media, waivers, and advertisements. It must also cease operations of the Adventure Hub from the trampoline park and stop the use of Urban Air's confidential information.

Signed on June 28, 2022, at Houston, Texas.

[signature]

Lynn N. Hughes
United States District Judge

---

[2] 15 U.S.C. § 1116(a).

**Addendum C**



*EXHIBIT A*

US010702729B2

(12) **United States Patent**
**Browning, Jr.**

(10) **Patent No.: US 10,702,729 B2**
(45) **Date of Patent: Jul. 7, 2020**

(54) **MULTI-LEVEL PLAY EQUIPMENT**

(71) Applicant: **Michael Browning, Jr.**, Grapevine, TX (US)

(72) Inventor: **Michael Browning, Jr.**, Grapevine, TX (US)

(73) Assignee: **UATP IP, LLC**, Grapevine, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 49 days.

(21) Appl. No.: **15/926,303**

(22) Filed: **Mar. 20, 2018**

(65) **Prior Publication Data**

US 2018/0272172 A1 Sep. 27, 2018

**Related U.S. Application Data**

(60) Provisional application No. 62/474,220, filed on Mar. 21, 2017.

(51) **Int. Cl.**

| | |
|---|---|
| ***A63B 9/00*** | (2006.01) |
| ***A63G 31/02*** | (2006.01) |
| ***A63G 31/10*** | (2006.01) |
| ***A63G 21/00*** | (2006.01) |
| ***A63G 21/22*** | (2006.01) |
| ***A63G 31/00*** | (2006.01) |
| ***A63B 69/00*** | (2006.01) |
| ***A63B 7/00*** | (2006.01) |
| ***A63G 21/20*** | (2006.01) |
| ***A63G 33/00*** | (2006.01) |
| ***A63G 9/00*** | (2006.01) |

(52) **U.S. Cl.**

CPC .................. ***A63B 9/00*** (2013.01); ***A63G 9/00*** (2013.01); ***A63G 21/00*** (2013.01); ***A63G 21/20*** (2013.01); ***A63G 21/22*** (2013.01); ***A63G 31/00*** (2013.01); ***A63G 31/02*** (2013.01); ***A63G 31/10*** (2013.01); ***A63G 33/00*** (2013.01); *A63B 7/00* (2013.01); *A63B 69/0064* (2013.01); *A63B 2009/002* (2013.01); *A63B 2009/004* (2013.01); *A63B 2009/006* (2013.01); *A63B 2208/12* (2013.01)

(58) **Field of Classification Search**

CPC ......... A63B 9/00; A63B 7/00; A63B 69/0064; A63B 2208/12; A63B 2009/002; A63B 2009/004; A63B 2009/006; A63G 9/00; A63G 21/00; A63G 21/20; A63G 21/22; A63G 31/00; A63G 31/10; A63G 33/00; A63G 31/02

USPC ........................................................ 472/128

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,814,416 | A | 6/1974 | Munger et al. |
| 4,337,941 | A | 7/1982 | Kitka |
| 5,203,829 | A | 4/1993 | Fisk et al. |
| 5,226,864 | A | 7/1993 | Showers |

(Continued)

*Primary Examiner* — Andrew S Lo

(74) *Attorney, Agent, or Firm* — Decker Jones PC; Brian K. Yost; Geoffrey A. Mantooth

(57) **ABSTRACT**

A play apparatus has plural types of elevated equipment, namely a ropes course and a zip coaster. Both types of elevated equipment have respective user safety supports that extend along the respective equipment and receive a safety harness worn by a user. The user need not change safety harnesses to use the different types of equipment. The entry and exit locations for the elevated equipment are in a common area elevated above the ground. A third type of equipment, namely an obstacle course, is located under and above the common area.

**12 Claims, 13 Drawing Sheets**





(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,853,332 | A | 12/1998 | Briggs | |
| 6,108,988 | A | 8/2000 | Nagelski et al. | |
| 6,174,242 | B1 | 1/2001 | Briggs et al. | |
| 6,193,633 | B1 | 2/2001 | Jonas et al. | |
| 7,631,728 | B2 | 12/2009 | Hill et al. | |
| 8,066,578 | B2 | 11/2011 | Liggett | |
| 2004/0077423 | A1* | 4/2004 | Weston | A63G 31/00 472/137 |
| 2006/0090960 | A1* | 5/2006 | Liggett | A62B 35/0056 182/36 |
| 2006/0189453 | A1* | 8/2006 | Leblond | A62B 35/0087 482/69 |
| 2007/0191123 | A1* | 8/2007 | Liggett | A63G 31/02 472/15 |
| 2009/0065300 | A1* | 3/2009 | Liggett | A63B 17/00 182/36 |
| 2009/0069104 | A1* | 3/2009 | Liggett | A63G 31/00 472/136 |
| 2009/0305799 | A1* | 12/2009 | Weston | A63G 3/00 472/128 |
| 2010/0203494 | A1* | 8/2010 | Scherba | A63G 9/00 434/365 |
| 2011/0083577 | A1* | 4/2011 | Tilley | B61B 7/06 104/96 |
| 2012/0010009 | A1* | 1/2012 | Sperry | A63B 17/00 472/92 |
| 2012/0083350 | A1* | 4/2012 | Frankowski | A63G 31/00 472/128 |
| 2013/0130867 | A1* | 5/2013 | Sperry | A63B 17/00 482/8 |
| 2015/0090148 | A1* | 4/2015 | Weston | A63G 21/20 104/91 |
| 2015/0141205 | A1* | 5/2015 | Garland | A63B 4/00 482/35 |
| 2015/0217783 | A1 | 8/2015 | Horihan | |
| 2016/0074687 | A1* | 3/2016 | Sann | A63B 17/02 482/35 |
| 2017/0043268 | A1* | 2/2017 | Briggs | A63G 31/02 |
| 2017/0157433 | A1* | 6/2017 | Cylvick | A62B 1/20 |
| 2017/0173378 | A1* | 6/2017 | Garland | A63B 9/00 |
| 2017/0197638 | A1* | 7/2017 | Perry | B61B 7/00 |
| 2017/0327129 | A1* | 11/2017 | Cylvick | B61B 12/002 |
| 2018/0326957 | A1* | 11/2018 | McGowan | A63G 21/22 |
| 2018/0369700 | A1* | 12/2018 | Cylvick | B61L 23/14 |

* cited by examiner


11
39
39
83
19
41
23A
91
29A
23E
37
51
17
15
85
29
23
23C
23D
51
61
23B
61
51
51
35
37
59
59

FIG. 1




FIG. 2




FIG. 3




FIG. 4




FIG. 5




FIG. 6




FIG. 7




FIG. 8




FIG 9




FIG. 10


59
57
59
55
53
51
61
51
61
29
11
15
25
17
51
27
29
17
51
23
31
27
51
85
41
77
19

FIG. 11




FIG. 12




FIG. 13

# MULTI-LEVEL PLAY EQUIPMENT

## FIELD OF THE INVENTION

The present invention refutes to play equipment that people can walk on, run on, climb on, ride on and otherwise enjoy.

## BACKGROUND OF THE INVENTION

Play equipment has evolved over the years. Early play equipment included a swing set and slide located outside in a residential yard or park. Over time, additions were made in the form of monkey bars, climbing apparatuses, elevated walkways, platforms, etc. Monkey bars are parallel bars or beams with cross-bars spaced like ladder rungs. Using the hands, a user hangs from the cross-bars and moves from one cross-bar to another. If a user should lose their grip, the user falls, typically feet first, onto the ground below. The ground may be pea gravel, which softens the landing. Platforms and elevated walkways are typically climbing equipment and are reached by climbing ladders. A user descends therefrom by slides, ladders or vertical poles.

Another type of play equipment includes ropes courses. While swing sets and associated climbing equipment typically take a relatively small area of ground, a ropes course takes up a much larger area and is elevated. A user ascends a pole to a platform, and walks or climbs across on ropes, boards, etc. Users wear a safety harness and are connected to a safety line or cable. The user is elevated sufficiently far above ground that if the user fell without safety equipment, injury could result.

Still another type of play equipment is a zip line. A zip line spans a long distance from one location to another and is elevated far above ground. The user is connected to a trolley or pulley and descends along the inclined zip line by way of gravity.

While outdoor play equipment continues in use, in many locales, play equipment can be found inside, in a temperature-controlled environment. Such indoor facilities offer the advantage of allowing play, regardless of the weather outside. In some locales, the weather can be warm or hot; the indoor facility is cooled with air conditioning. In other locales, the weather can be cold; the indoor facility is warmed. Indoor facilities also provide lighting to allow play activities to occur past sunset.

Indoor facilities include a variety of activities, such as trampolines and bounce houses (having inflated walls and floors). Padding is provided where needed. For example, with trampolines, padding is provided along the sides of the trampoline. The padding is typically foam covered in a plastic outer layer. In addition to the play equipment, some indoor facilities also include food sales and areas with tables to dine at.

Some indoor facilities are located in former industrial, retail, office, or flex buildings, with high roofs and ceilings, or with the floors cut through to create high ceilings. There is a desire to install elevated play equipment in these high roofed buildings, in order to increase the enjoyment for users. One such elevated type of equipment is a ropes course. Some ropes courses, particularly those for small children, may be a short distance above the floor, which floor is padding. If a child should fall, the child lands on soft padding. Many ropes courses however are elevated some distance above the floor, high enough to walk under. These ropes courses require the user to wear a safety harness.



Should a user fall, the fall is arrested by the safety harness and the user is slopped short well above ground.

Another elevated type of equipment is a zip coaster, or roll glider. A zip coaster is a rail that drops gradually in elevation from beginning to end. A user wears a harness and, suspended underneath, rides the rail on a type of trolley. The trolley moves in a gradual descent with low friction on the rail, pulled by the weight of the user. Zip coaster rails are typically curved, thus allowing the user to swing to the outside of the curve, further adding to the enjoyment of the ride.

In the prior art, there are several multi-level types of play equipment. Showers U.S. Pat. No. 5,226,864 shows a playground maze apparatus having four levels. Users can move from one level to another by climbing through apertures in the floors or ceilings of a level. Once on a particular level, the user can move around rooms and maze configurations.

Nagelski U.S. Pat. No. 6,108,988 shows a tower with a spiral staircase. Openings are provided on an outer wall to allow children to climb through.

Jonas U.S. Pat. No. 6,193,633 shows a climbing wall extending to an upper level, which upper level is also accessible by a ladder.

Munger U.S. Pat. No. 3,814,416 shows ladders and horizontal bars arranged in vertical and inclined positions to create climbing structures.

Kitka U.S. Pat. No. 4,337,941 shows a climbing structure with ladders, horizontal half logs and vertical poles, as well as a slide.

Briggs U.S. Pat. Nos. 5,853,332 and 6,174,242 show multi-level play structures having devices that shoot soft projectiles.

It is desired to improve play structures, and in particular to provide play structures with different types of elevated equipment to enhance the enjoyment by users.

## SUMMARY OF THE INVENTION

A play apparatus comprises a first type of elevated equipment. The first elevated equipment has a first user safety support that extends for a first traverse. The first user safety support is elevated above the ground level. The first user safety support receives a safety harness worn by a user and allows the safety harness to move with the user along the first traverse. The first elevated equipment has a first entry location for the user to enter the first elevated equipment and a first exit location for the user to exit the first elevated equipment. A second type of elevated equipment has a second user safety support that extends for a second traverse distance. The second user safety support is elevated above the ground level. The second user safety support receives the safety harness worn by the user. The second user safety support allows the safety harness to move with the user along the second traverse. The second elevated equipment has a second entry location for the user to enter the second elevated equipment and a second exit location for the user to exit the second elevated equipment. A common area is elevated above the ground. The common area includes the first entry location, the first exit location, the second entry location and the second exit location.

In accordance with one aspect, the first type of elevated equipment is different than the second type of elevated equipment.

In accordance with another aspect, the first type of elevated equipment comprises a ropes course.

In accordance with another aspect, the second type of elevated equipment comprises a zip coaster.

In accordance with another aspect, the zip coaster further comprises a rail, further comprising a control device located on the rail and moveable between blocking and open positions, wherein when the control device is in the blocking position, forward movement of a trolley on the rail past the control device is stopped and when the control device is in the open position, forward movement of the trolley past the control device is allowed.

In accordance with another aspect, the first entry location and the first exit location are one location.

In accordance with another aspect, a loading area is provided. The loading area comprises am entry gate that allows entry to the second entry location and an exit gate that allows exiting from the second exit location.

In accordance with another aspect, a third type of equipment is located under the common area.

In accordance with another aspect, the third type of equipment comprises an obstacle course.

In accordance with another aspect, the third type of equipment has portions located above the common area.

In accordance with another aspect, the first type of elevated equipment comprises a ropes course. The second type of equipment comprises a zip coaster. A loading area is provided, which loading area comprising an entry gate that allows entry to the second entry location and an exit gate that allows exiting from the second exit location. A third type of equipment is located under the common area.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a plan view of multi-level play equipment, in accordance with a preferred embodiment.

FIG. **2** is an elevational view of the equipment of FIG. **1**, taken on the left side.

FIG. **3** is an elevational view of the equipment of FIG. **1**, taken on the rear side.

FIG. **4** is an elevational view of the equipment of FIG. **1**, taken on the right side.

FIG. **5** is an elevational view of the equipment of FIG. **1**, taken on the front side.

FIG. **6** is a top view of the first level of the third type of equipment.

FIG. **7** is a top view of the second level of the third type of equipment, showing portions of the first and second types of equipment.

FIG. **8** is a top view of the third level of the play equipment, showing portions of the first and second types of equipment.

FIG. **9** is a top view of the fourth level of the play equipment, showing portions of the first and second types of equipment.

FIG. **10** is a perspective view of the equipment from the front side.

FIG. **11** is a perspective view of the equipment from the upper front and right sides.

FIG. **12** is a plan view of a loading area and surroundings for the zip coaster, in accordance with one embodiment.

FIG. **13** is a side view of a one-way control device on the zip coaster rail.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention combines several different types of equipment, ranging from ground level, to above the ground, and elevated, all of which make for an efficient use of space and which is enjoyable to use. Such elevated equipment is located a sufficient distance above the ground or other structure such that a user wears a safety harness or other safety device in case the user should fall. An example of another type of equipment is climbing equipment. Such climbing equipment includes multiple levels that users access by stairs, ladders, slides, etc. The levels are typically stacked vertically.

In the preferred embodiment, one type of elevated equipment is a ropes course. A user traversing the ropes course is located at a first elevation above ground. The load bearing surfaces or structures for the user are located at the first elevation.

Another type of elevated equipment is a zip coaster. The zip coaster has a rail that begins at a second elevation and ends at a lower elevation; gravity pulls the user along the rail from beginning to end. The second elevation is different from the first elevation. For example, the second elevation can be higher than the first elevation.

The several types of elevated equipment utilize a common elevated area for entry onto and egress from the respective pieces of equipment. The several types of elevated equipment require users to wear safely harnesses or other safety equipment in case the users should fall. In many cases, the elevated equipment may be located eight feet or more above the ground or floor. Such heights are sufficiently high so that is a user should fall from the elevated equipment and land on the ground or floor, injury may result, even if the floor is padded.

The space underneath the common elevated area contains a third type of equipment. This space is typically on ground level.

Although the preferred embodiment describes an indoor environment, the equipment can be used in an outdoor environment.

The specifies of the playground equipment **11** will now be described. In the description, references to the orientation of the equipment of FIG. **1** will be used. Such references include "front", which is taken from the bottom of FIG. **1** and shown in FIG. **5**, "rear", which is taken from the top of FIG. **1** and shown in FIG. **3**, "right" and "left" which are the right and left sides of FIG. **1** and shown in FIGS. **4** and **2** respectively.

The playground equipment includes several types of equipment. There is a first type **15**, a second type **17** and a third type **19** (FIGS. **1-5**). There may be additional types in other embodiments. The first and second types are elevated. In the preferred embodiment, the first type **15** is a ropes course and the second type **17** is a zip coaster. In the preferred embodiment, the third type of equipment is climbing equipment **19**.

The user wears a safety harness to use the first and second types of equipment. Because the first and second types of equipment are elevated, if the user should foil to the ground, injury could result. The safety harness prevents a fall to the ground. The same safety harness can be used for each of the first and second types of equipment. This allows the user to change from one type of equipment to another without changing out of the safety harness. Such multiple uses add to the overall safety as the user is elevated above the ground in accessing the equipment. The user need not don and doff the safety harness when changing equipment.

The safety harness is conventional and commercially available. Examples of safety harnesses are shown and described in U.S. Pat. Nos. 5,203,829 and 7,631,728, the entire disclosures of which are incorporated by reference. Typically, a safety harness has loops for securing around the upper legs of a user, as well as straps along the chest and

back of the user. The chest and back straps extend vertically and horizontally so as to secure the user in case the user should fall. The straps can be adjusted to accommodate different size users. A child will need the straps to be shorter than an adult. One or more vertical straps or lines extend up from the chest of back straps to connect to the safety or support apparatus above the user. The upper end of the vertical strap is a loop, typically of the carabiner type, that can be selectively opened to allow the strap and harness to be connected and unconnected to the support apparatus. The safety harness allows the user to walk freely and use their arms and hands.

The first type of equipment **15**, or ropes course, is elevated above the floor or ground surface **21** (see FIGS. **1-5**, **10-11**). This adds to the enjoyment of the play, as users walk with their feet and traverse various paths at heights above the ground. The ropes course includes vertical supports **23**, user safety supports **25** and user foot supports **27**. The vertical supports **23** elevate the user foot supports **27** above ground, as well as the user safety supports **25** above the user foot supports. A user traverses by foot along the user foot supports **27**. The user wears a safety harness which is secured to the to a user safety support **25** above the path.

The vertical supports **23** are typically posts or poles that extend from the floor **21** up to a distance. If the equipment is inside of a building, the vertical supports may extend to the ceiling of the building. Such a ceiling typically has trusses for supporting a roof. The poles **23** extend to and are connected to the ceiling trusses. If a pole is not aligned directly under a ceiling truss, a crossbar between trusses is used across the top of the pole. As an alternative, the top ends of the poles can be secured by cables extending to ceiling trusses, or other support structure. Thus, the poles are firmly anchored at the top and the bottom ends. The poles **23** are spaced apart horizontally from each other and are arranged in a spatial configuration. Some poles may be on an outside edge of the ropes course, while other poles may be on the inside. Each pole includes a platform **29** for users to stand on, as well as a hub **31** located above the platform.

The user safety supports **25** span horizontally between the hubs **31** of the poles. The user safety supports support the user in case the user should fall. The hubs **31** and the user safety supports **25** allow a harness supporting a user to traverse along from one pole **23** to another. The user safety support **25** can be a rigid beam that extends from one hub to another. The beam may be rectangular in transverse cross-section, with a bottom plate. The bottom plate has a longitudinal gap or slot therein. The bottom plate and slot form a track. The track receives a moveable member, such as a disc, with a short length of cable depending therefrom. Such an arrangement is shown and described in Liggett, U.S. Pat. No. 8,066,578 and Horihan, U.S. Patent Publication No. 20150217783, the entire disclosures of which are incorporated herein by reference. If desired, one or more rollers can be provided to reduce friction along the length of the beam. A loop is formed on the bottom end of the cable. The loop receives the carabiner of a safely harness.

When the user is connected by the safety harness to the support, the user is able to move generally in the direction of the longitudinal axis of the support, with the disc sliding inside of the beam. Due to some slack in the vertical strap of the safety harness extending up to the safety support, the user can move some distance in a transverse direction relative to the support.

As an alternative user safety support, a cable can be used, which cable extends between the adjacent poles. A pulley or trolley is used to connect to the safety harness and move along the cable. Such pulleys and trolleys are conventional and commercially available.

The user foot supports **27** span horizontally between the platforms **29** of the poles **23** and form paths or traverses. In general, the user foot support are designed to be difficult for a user to walk across from one platform to another. One example is a horizontal rope ladder, having rope rails that extend from one platform to another, and steps or rungs between the rails. The steps can be rope or wooden boards. The steps move somewhat as the user steps thereon, adding to the challenge of the traverse. Another example is a single length of rope extending between two platforms; the user walks along the foot rope. To provide the user with a hand hold, a rope net extends along the foot rope. Alternatively, two upper ropes extend parallel to the foot rope, forming a "V" configuration when viewed from the end. The foot rope is at the bottom of the "V", while the hand rails are above and laterally offset. Still another example is a narrow beam for the user to walk along. The beam is rigid and does not move, but the narrowness increases the challenge of walking across. Still another example is a series of shaped steps mounted to a beam. The steps are fixed, but present relatively small surface area on which to stand. The steps may be circular to simulate stepping on rocks. Still another example is a series of swings; the user steps from one swing to another, holding onto the swing ropes for stability. The swings of course move as the user steps thereon.

Horizontal beams may be provided under the user foot supports to further provide rigidity and stability to the poles. This is particularly the case if the user foot supports do not incorporate rigid beams. Generally, the user foot supports and any horizontal beams are well above the ground to allow adult humans to walk underneath.

Each pole **23** serves as the junction of two or more user foot supports **27** and the respective user safety supports **25**. The user foot supports **27** lead to the platforms **29**. The hubs **31** connect the user safety supports **25**. A user arriving on a platform **29** from one user foot support exits the platform on another user support. The safety harness is able to move from one user safety support **25** across the hub **31** to the other respective user safety support. Preferably, the user need not disconnect and reconnect the safety harness to the user safety support when changing traverses. In this manner, the user moves around the ropes course.

In the preferred embodiment, there is a start/finish platform **29**A and associated pole **23**A (see FIGS. **1** and **8**). A user starts or enters the ropes course from this platform **29**A, traverse various foot supports and ends on the same platform **29**A to exit the ropes course. In other embodiments, there may be a start platform on one pole and a separate finish platform on another pole.

The other platforms **29** and poles **23** are spaced apart from the start/finish platform **29**A and from each other. A typical arrangement is shown in FIG. **1**, where the poles are arranged in a triangular configuration, with each pole being an apex of a triangle. In the arrangement shown, the overall shape is somewhat of a hexagon, which hexagon has six triangular areas and a central pole. Another triangular area extends to a side of the hexagon, which area connects to the start/finish pole. Other configurations can be used besides triangular or hexagonal.

Before discussing further the area around the start/finish pole, the zip coaster **17** will be discussed first (see FIGS. **1-5**, **10-11**). The zip coaster has a rail **35** that is elevated above the ground **21** and that runs in a continuous loop. The rail **35** has a riding section **37** and a recovery section **39**. The rail

changes elevations. At a starting area, or platform **41**, the rail is at its highest elevation. At a recovery area **43**, the rail is at its lowest elevation. The users ride along the riding section, which section has a gentle downward slope. The users are suspended beneath the rail **35** in a safely harness and with their feet hanging tree, pulled by gravity along the rail. The riding section extends from the starting area **41** to the recovery area **43** and the rail slopes down. For example, the slope may be 20:1, or a foot drop for each 20 feet of horizontal run. In the recovery area, the users are connected to and disconnected from the rail, while still wearing the safety harness. In the recovery section, the rail extends from the recovery area back to the starling area and rises back to the highest elevation. The recovery section is typically much shorted and steeper than the riding section.

The rail **35** is a cylindrical tube **45** with a flange **47** that extends vertically up (see FIG. **10**). The flange **47** extends longitudinally along the tube **45**. A trolley **49** (see FIG. **8**) is slung under the rail and rides along the upper surfaces of the rail. The trolley also has rollers that engage the sides of the flange. A yoke depends from the trolley. The yoke has a loop for receiving a carabiner of a safety harness. A user connects a safety harness to the yoke. The yoke also has lengths of rope that depend down. The user grips the ends of the ropes with the hands to provide some stability during the ride. Zip coaster rails and trolleys are conventional and commercially available.

The flange **47** is used to support the rail above the ground. The rail can be supported above ground by several arrangements. One arrangement is by trusses **51** (see FIG. **11**) which are separate from the ceiling trusses, which trusses are supported by the ropes course posts **23** and the building. In the embodiment shown, the riding section **37** of the rail is supported by the trusses **51**. Each truss **51** is generally triangular shaped, having a top beam **53** and a bottom beam **55**. The top beam **53** is connected to a ropes course post **23** and extends across the rail **35** some distance. The bottom beam **55** extends from a lower location on the same ropes course post **23** to the end of the top beam to form an apex, or free end **57**, of the triangular truss. In the embodiment shown, where the rail **35** encircles the ropes course **17**, each of the outer poles has a truss **51** extending out over the rail. To maintain lateral stability the trusses **51** are connected together at their free ends. Cables **59** extend from each free end **57** to adjacent truss free ends. Cables **61** also extend from each free end **57** to a lower portion of adjacent poles **23**. The trusses are located above the rail (not all cables **61** are shown). Cables (not shown) extend from the trusses **51** to anchor points along the rail flange **47**. At each anchor point, several cables extend to adjacent trusses and ropes course poles **23**. The ropes course poles are laterally offset from the rail. More than one cable is used for each anchor point to minimize swaying or other movement of the rail.

The upper portions of the ropes course poles **23** are reinforced by cables **63** leading to other poles (see FIGS. **2** and **5**). For example, with the hexagonal arrangement shown in FIG. **1**, cables extend from pole **23**B to poles **23**C, **23**D and **23**E. These cables are located above the ropes course user safety support **25** so as not to interfere with the user safety equipment. One cable **63** extends from the top of pole **23**B to a lower portion of pole **23**C, while a second cable **63** extends from the top of pole **23**C to a lower portion of pole **23**B, thus forming a cross-work of cables. Similar cross-works are formed between poles **23**B and **23**D and between poles **23**B and **23**E. Likewise, other cable cross-works are formed between other adjacent poles. The trusses **51** preferably are in line with the reinforcing cables **63**. The center pole **23**D may be shorter and not extend above the user safety support, in order to stay clear of the reinforcing cables.

Another arrangement is to support the rail from the ceiling trusses, or other ceiling support structure, of the building. Cables extend from the trusses to various anchor points along the flange. Still another arrangement is to use separate poles to support the rail by way of cables. These separate poles are not used to support the ropes course. Still another arrangement is to use a rigid support on poles. The poles are located near to the rail at the anchor points. Yet, the poles are spaced far enough away to avoid contact with users riding the rail. A lateral beam extends from the pole to over the rail and a vertical support extends from the beam down to the rail. The recovery section **39** of the rail uses pole supports.

The rail **35**, forming a continuous loop, can have a variety of plan view shapes. In general, the rail has curves to enhance the riding pleasure. As a user rides the rail along a curve, the user's body swings to the outside of the curve. Therefore, the rail is positioned relative to other objects so as to provide sufficient clearance for the user. If the user moves clockwise (when in plan view) along the rail, due to the closed loop nature of the rail the curves will be primarily to the right (right hand curves from the user's perspective). However, the rail can also curve in the opposite direction, to the left (left hand curves). The rail shown in FIG. **1** has several right hand curves, two of which are about ninety degrees. The rail also has several left hand curves, located between the right hand curves. The left hand curves are smaller, or less of a curve, than the right hand curves.

The zip coaster **17** and the ropes course **15** may be nested one inside of the other. FIG. **1** shows the zip coaster rail extending around the periphery of the ropes course. The ropes course **15** lies completely within the loop of the zip coaster rail **35**. This makes efficient use of floor or ground space of the facility. The zip coaster rail can be over open floor space, or it can be over occupied floor space. Such occupied floor space can be taken up by other equipment such as tables, chairs, even rooms with partition walls. The partition walls extend up, stopping short some distance from the ceiling so as not to interfere with a user of the zip coaster. Other equipment that requires some height above the floor, such as trampolines or those involving ball throwing, are typically not located under the zip coaster, unless the height of the zip coaster allows sufficient vertical clearance. The same is true of the ropes course or other elevated equipment. Although the embodiment shown nests the ropes course inside the zip coaster, this need not be the case. The ropes course can be outside of the zip coaster, or some other configuration could be used.

The ropes course **15** and the zip coaster **17**, being elevated, have access and exit locations that are elevated. These access and exit locations are combined with the third type of equipment, which is located under and at the same level of the access and exit locations to the rope course and the zip coaster. In the preferred embodiment, the third piece of equipment is a multi-level obstacle course **19**.

The obstacle course has, in the embodiment shown, four levels, namely in ascending order: the ground, or first, level (see FIG. **6**), the second level (see FIG. **7**), the third level (see FIG. **8**), and the fourth level (see FIG. **9**). Each level has vertical poles **71** or posts, floors **73**, and cross members **75** that extend between the posts. The height of the levels need not be the same. Some levels may be designed for children and thus have a lower height that levels designed to accommodate adults. The outer sides of the levels are spanned by netting or some other barrier material to prevent people from

passing therethrough. This is particularly desirable on the upper levels. In addition, barrier material is provided at other locations where desired. The ground level has entry and exit locations **77**. These entry and exit locations are typically located on one side. As users enter the ground level, they traverse by walking or running or even crawling and pass through or by various objects of interest **79**, such as tubes, swinging cylinders, gates, net flooring, bars, swinging balls, etc. Padding is provided where needed. Users can move to the next level by ascending stairs or ladders, or crawling through holes. Users can descend to a lower level or exit the equipment by slides.

The second level (see FIG. **7**) is reachable by stairs **81** from the first level and offers more of the same type of obstacles as found on the first level.

The third level (see FIG. **8**) is a common area **83** for the ropes course and the zip coaster. The third level is reachable directly from the ground by stairs **85**. Thus, adults or children who wish to bypass the obstacle levels can ascend to the third level. As another way to access the third level, stairs **81** lead from the second level to the third level. These stairs are on the opposite side from the ground level stairs.

From this common area **83**, users can enter the ropes course and the zip coaster. The users put on safety harnesses. Attendants are provided to ensure that the harnesses are correctly worn. The harnesses can be put on while a user is in the common area. Alternatively, the harnesses can be put on while the user is on the floor, before ascending to the third level.

The common area, or third level, may have partitions and gates **87** through the partitions to control access to the elevated equipment. This level also may have obstacle type equipment, as a continuation or extension of the obstacle equipment on the other levels. Access and exit locations are provided. The obstacle area may be partitioned from the areas serving the elevated equipment.

Once harnessed, a user is secured to the ride of choice. For the ropes course **15**, the user's harness is coupled to the cable depending from the disc in the user safety support **25**. A gate **81** on the third level controls access to the ropes course. Typically, the gate is closed, cutting off access to the ropes course, until the user is safely secured. The user then passes through the gate and steps on the platform **29**A of the start/finish pole. Typically, this platform is at the same level as the common area floor, but it may be higher or lower. The user then walks along one of the traverses leading from the platform, to reach the next platform **29**, and so on along the various traverses. As the user walks, the safety harness pulls the disc along the track of the user safety support **25**. To finish and exit the ropes course, the user returns to the platform of the start/finish pole and passes through the gate, to stand on the common area once again. There, the user is disconnected from the user safety support. The user continues to wear the safety harness.

The user may proceed to the zip coaster **17**. A gate **87** may be used to control access to the zip coaster. Passing through the gate the user moves to the loading area for the zip coaster. The loading area is in the common area and on the third level. The loading area is a floor area under the recovery section **39** of the rail. The user is assigned to a trolley. For safety reasons, the trolleys remain on the rail and are not removed therefrom. The user is secured by way of the safety harness to the trolley. Once secured, the user ascends stairs, or a ramp, **89** to the starting platform **41**. The safety harness pulls the trolley along the upwardly inclined rail. The platform is located above the third level at a higher elevation.



Once on the platform **41**, the user can step or leap off and ride the zip coaster. Stepping or leaping off the platform suspends the user by the safety harness beneath the trolley. The user is provided with ropes to hold on to by the hands. The user's feet are free. Gravity pulls the trolley along the riding section **37** of the rail **35**. As shown on the left sides of FIGS. **3** and **4** and the right side of FIG. **5**, the rail is over ground, which ground may be occupied by other objects (tables, queues for lines, etc.). As the user rides, the user passes over these areas and objects. If the ropes course is nearby, the user passes along an edge of the ropes course.

Near the end of the ride, the user enters a funnel shaped recovery area **91** (see FIGS. **1** and **8**), having padded bottom and side walls. The recovery area narrows in cross-sectional area over a distance. This assists in stabilizing a rider who may be swinging to one side or the other. The bottom of the recovery area slopes up to the third level, which allows the user to place their feet again on the floor of the third level. Once the user is standing and has passed through a gate **87**, the safely harness is disconnected from the trolley. The user can exit the zip coaster loading area through a gate. The trolley is reused by the next user.

The exit the third level a user can descend the stairs **85** to the ground, or the stairs to the second level, or ride a slide to the ground.

The obstacle portion of the third level has access to a fourth level by way of stairs. The fourth level contains additional obstacles. In the embodiment shown the fourth level is located on a corner to provide visibility. The zip coaster platform may be at the same elevation as the fourth level, or at a different elevation.

FIG. **12** shows an entry and exit area for the zip coaster, in accordance with another embodiment. In this embodiment, a user enters and exits in the same location. The zip coaster rail **35** is shown, with several trolleys **49** at the ready. A padded floor **101** is located underneath the rail. The direction of trolley travel in the figure is left to right. A barrier **103** closes off the zip coaster area from the common area to control users for their safety. The barrier **103** has a gap therein, with a loading area **105** being provided through the gap. The loading area is isolated from the zip coaster area by an entry gate **107** and an exit gate **109**. The gates form a triangular shaped loading area **105**.

A user typically dons a safety harness before entering the loading area, although the user can don the harness in the loading area. When a user stands in the loading area, an attendant, who stands outside of the loading area, checks the safety harness for proper fit and couples the safety harness to a trolley **49**. Once satisfied with the proper connections and fit, the attendant opens or unlatches the entry gate **107** to allow the user to enter the zip coaster area, closing the gate **107** after. Another check can be performed, namely a slack test. The user descends into a depression **111** or well in the floor surface **101**. This tests the slack in the safety harness. The attendant can adjust the tightness of the harness to allow the user to be suspended at the desired distance below the trolley. The user steps back onto the floor **101**.

A control device **115** is provided on the zip coaster rail. The device **115** prevents users from moving along the zip coaster rail in an unapproved manner. Should a user try to move along the rail before the attendant is satisfied with the safety arrangements, the trolley contacts the control device **115** and is stopped from moving any further forward. The user is thus prevented from traversing along the zip coaster in an unauthorized manner. In the embodiment shown in FIG. **12**, the control device **115** is located at the base or bottom portion of the ramp **82**.

Referring to FIG. **13**, the control device has a mounting member **117** and a pivoting member **119**. The mounting member **117** has parallel plates separated by a gap, which gap receives the upper edge of the flange **47** of the rail **35**. A fastener **121** secures the mounting member to the flange **47**. A spacer plate **123** in the gap contacts the upper edge of the flange. The pivoting member **119** is shaped like an upside down "U" and is pivotally mounted to the mounting member **117**. The pivoting member **119** moves between a blocking position (shown in solid lines in FIG. **13**) and an open position (shown in dashed lines). The pivoting member is normally in the blocking position. In the blocking position, the pivoting member blocks the trolley **49** from moving in the forward direction (right to left in FIG. **13**). Raising the pivoting member to the open position allows the trolley to move past the control device.

The device **115** is a one-way device. If the trolley is located down the rail and moves in the reverse direction (left to right in FIG. **13**), the pivoting member moves to the open position, without the need for an attendant. This allows a user to reach the top of the ramp **89** and change their mind, to retreat back to the loading area without traversing the zip coaster.

When the attendant is satisfied with the readiness of the user, the attendant reaches up with a hand to move the pivoting member **119** to the open position, so that the trolley can pass underneath. The pivoting member can be provided with flanges **125** to allow for better contact or a grip.

The user moves under the control device, climbs the ramp **89** and traverses the zip coaster, returning along the floor **101** (left side of FIG. **12**). The attendant opens the gate **109** and the user moves into the loading area **105**. After closing the gate **19**, the attendant disconnects the harness from the trolley.

The process repeats with the next user.

Thus, the equipment provides a safe and enjoyable venue for users in a compact space.

The foregoing disclosure and showings made in the drawings are merely illustrative of the principles of this invention and are not to be interpreted in a limiting sense.

The invention claimed is:

**1**. A play apparatus, comprising:

a) a first type of elevated equipment, the first elevated equipment having a first user safety support that extends for a first traverse, the first user safety support elevated above the ground level, the first user safety support configured to receive a safety harness worn by a user and allowing the safety harness to move with the user along the first traverse, the first elevated equipment having a first entry location for the user to enter the first elevated equipment and a first exit location for the user to exit the first elevated equipment;

b) a second type of elevated equipment, the second elevated equipment having a second user safety support that extends for a second traverse distance and that forms a closed loop, the second user safety support elevated above the ground level, the second user safety support configured to receive the safety harness worn by the user, the second user safety support allowing the safety harness to move with the user along the second traverse, the second elevated equipment having a second entry location for the user to enter the second elevated equipment and a second exit location for the user to exit the second elevated equipment;

c) a common hub area comprising a platform that is elevated above the ground at a platform elevation, the common hub area including the first entry location, the first exit location, the second entry location and the second exit location, the first type of elevated equipment extending for the first traverse from the first entry location away from the common hub area and returning to the common hub area at the first exit location, the second type of elevated equipment extending for the second traverse from the second entry location away from the common hub area and returning to the common hub area at the second exit location, at least one of the second entry location or the second exit location at the platform elevation, the other of the second entry location or the second exit location located at a different elevation than the platform elevation.



**2**. The play apparatus of claim **1** wherein the first type of elevated equipment is different than the second type of elevated equipment.

**3**. The play apparatus of claim **2** wherein the first type of elevated equipment comprises a ropes course.

**4**. The play apparatus of claim **2** wherein the second type of elevated equipment comprises a zip coaster, the zip coaster comprising a rail that extends from the common area in a closed loop, the zip coaster also comprising at least one trolley that moves along the rail and allows a user to be suspended below the trolley.

**5**. The play apparatus of claim **1** wherein the first entry location and the first exit location are one location.

**6**. The play apparatus of claim **1** further comprising a loading area, the loading area comprising an entry gate that allows entry to the second entry location and an exit gate that allows exiting from the second exit location.

**7**. The play apparatus of claim **1** further comprising a third type of equipment located under the common hub area.

**8**. The play apparatus of claim **7** wherein the third type of equipment comprises an obstacle course.

**9**. The play apparatus of claim **7** wherein the third type of equipment has portions located above the common hub area.

**10**. The play apparatus of claim **1** wherein:

a) the first type of elevated equipment comprises a ropes course;

b) the second type of equipment comprises a zip coaster;

c) a loading area, the loading area comprising an entry gate that allows entry to the second entry location and an exit gate that allows exiting from the second exit location;

d) a third type of equipment located under the common hub area.

**11**. The play apparatus of claim **1** wherein the common hub area is elevated above the ground at a single platform elevation.

**12**. A play apparatus, comprising:

a) a first type of elevated equipment, the first elevated equipment having a first user safety support that extends for a first traverse, the first user safety support elevated above the ground level, the first user safety support configured to receive a safety harness worn by a user and allowing the safety harness to move with the user along the first traverse, the first elevated equipment having a first entry location for the user to enter the first elevated equipment and a first exit location for the user to exit the first elevated equipment;

b) a second type of elevated equipment, the second elevated equipment having a second user safety support that extends for a second traverse distance, the second user safety support elevated above the ground level, the second user safety support configured to receive the safety harness worn by the user, the second user safety support allowing the safety harness to move with the

user along the second traverse, the second elevated equipment having a second entry location for the user to enter the second elevated equipment and a second exit location for the user to exit the second elevated equipment;

c) a common area elevated above the ground, the common area including the first entry location, the first exit location, the second entry location and the second exit location;

d) wherein the first type of elevated equipment is different than the second type of elevated equipment;

e) wherein the second type of elevated equipment comprises a zip coaster;

f) the zip coaster further comprises a rail;

g) further comprising a control device located on the rail and moveable between blocking and open positions, wherein when the control device is in the blocking position, forward movement of a trolley on the rail past the control device is stopped and when the control device is in the open position, forward movement of the trolley past the control device is allowed.

* * * * *