**2022-2047**

# United States Court of Appeals for the Federal Circuit

UATP IP, LLC, UATP MANAGEMENT, LLC,

*Plaintiffs-Appellees,*

– v. –

KANGAROO, LLC,

*Defendant-Appellant,*

AIR ENTERTAINMENT GROUP, LLC, HAI CHANH QUACH, DAN TRINH, RAYMON HUNG, EDGAR ALEJANDRO GUERRERO, ALAN TRINH, TINA LUU, GOLDEN STAR GROUP, LTD.,

*Defendants.*

*On Appeal from the United States District Court for the Southern District of Texas in No. 4:21-cv-02478, Honorable Lynn N. Hughes, Judge*

## BRIEF FOR PLAINTIFFS-APPELLEES

CHRIS P. HANSLIK
BOYARMILLER
2925 Richmond Avenue, 14th Floor
Houston, Texas 77098
(713) 999-9312
chanslik@boyarmiller.com

*Counsel for Plaintiffs-Appellees*

# LANGUAGE OF PATENT CLAIM

## US 10,702,729 B2

Play equipment has evolved over the years. Early play equipment included a swing set and slide located outside in a residential yard or park. Over time, additions were made in the form of monkey bars, climbing apparatuses, elevated walkways, platforms, etc. Monkey bars are parallel bars or beams with cross-bars spaced like ladder rungs. Using the hands, a user hangs from the cross-bars and moves from one cross-bar to another. If a user should lose their grip, the user falls, typically feet first, onto the ground below. The ground may be pea gravel, which softens the landing. Platforms and elevated walkways are typically climbing equipment and are reached by climbing ladders. A user descends therefrom by slides, ladders or vertical poles.

Another type of play equipment includes ropes courses. While swing sets and associated climbing equipment typically take a relatively small area of ground, a ropes course takes up a much larger area and is elevated. A user ascends a pole to a platform, and walks or climbs across on ropes, boards, etc. Users wear a safety harness and are connected to a safety line or cable. The user is elevated sufficiently far above ground that if the user fell without safety equipment, injury could result.

Still another type of play equipment is a zip line. A zip line spans a long distance from one location to another and is elevated far above ground. The user is connected to a trolley or pulley and descends along the inclined zip line by way of gravity.

While outdoor play equipment continues in use, in many locales, play equipment can be found inside, in a temperature-controlled environment. Such indoor facilities offer the advantage of allowing play, regardless of the weather outside. In some locales, the weather can be warm or hot; the indoor facility is cooled with air conditioning. In other locales, the weather can be cold; the indoor facility is warmed. Indoor facilities also provide lighting to allow play activities to occur past sunset.

Indoor facilities include a variety of activities, such as trampolines and bounce houses (having inflated walls and floors). Padding is provided where needed. For example, with trampolines, padding is provided along the sides of the trampoline. The padding is typically foam covered in a plastic outer layer. In addition to the play equipment,

some indoor facilities also include food sales and areas with tables to dine at.

Some indoor facilities are located in former industrial, retail, office, or flex buildings, with high roofs and ceilings, or with the floors cut through to create high ceilings. There is a desire to install elevated play equipment in these high roofed buildings, in order to increase the enjoyment for users. One such elevated type of equipment is a ropes course. Some ropes courses, particularly those for small children, may be a short distance above the floor, which floor is padding. If a child should fall, the child lands on soft padding. Many ropes courses however are elevated some distance above the floor, high enough to walk under. These ropes courses require the user to wear a safety harness. Should a user fall, the fall is arrested by the safety harness and the user is slopped short well above ground.

Another elevated type of equipment is a zip coaster, or roll glider. A zip coaster is a rail that drops gradually in elevation from beginning to end. A user wears a harness and, suspended underneath, rides the rail on a type of trolley. The trolley moves in a gradual descent with low friction on the rail, pulled by the weight of the user. Zip coaster rails are typically curved, thus allowing the user to swing to the outside of the curve, further adding to the enjoyment of the ride.

The foregoing disclosure and showings made in the drawings are merely illustrative of the principles of this invention and are not to be interpreted in a limiting sense.

The invention claimed is:

**1.** A play apparatus, comprising:

a) a first type of elevated equipment, the first elevated equipment having a first user safety support that extends for a first traverse, the first user safety support elevated above the ground level, the first user safety support configured to receive a safety harness worn by a user and allowing the safety harness to move with the user along the first traverse, the first elevated equipment having a first entry location for the user to enter the first elevated equipment and a first exit location for the user to exit the first elevated equipment;

b) a second type of elevated equipment, the second elevated equipment having a second user safety support that extends for a second traverse distance and that forms a closed loop, the second user safety support elevated above the ground level, the second user safety support configured to receive the safety harness worn by the user, the second user safety support allowing the safety harness to move with the user along the second traverse, the second elevated equipment having a second entry location for the user to enter the second elevated equipment and a second exit location for the user to exit the second elevated equipment;

c) a common hub area comprising a platform that is elevated above the ground at a platform elevation, the common hub area including the first entry location, the first exit location, the second entry location and the second exit location, the first type of elevated equipment extending for the first traverse from the first entry location away from the common hub area and returning to the common hub area at the first exit location, the second type of elevated equipment extending for the second traverse from the second entry location away from the common hub area and returning to the common hub area at the second exit location, at least one of the second entry location or the second exit location at the platform elevation, the other of the second entry location or the second exit location located at a different elevation than the platform elevation.

**2.** The play apparatus of claim **1** wherein the first type of elevated equipment is different than the second type of elevated equipment.

**3.** The play apparatus of claim **2** wherein the first type of elevated equipment comprises a ropes course.

**4.** The play apparatus of claim **2** wherein the second type of elevated equipment comprises a zip coaster, the zip coaster comprising a rail that extends from the common area in a closed loop, the zip coaster also comprising at least one trolley that moves along the rail and allows a user to be suspended below the trolley.

**5.** The play apparatus of claim **1** wherein the first entry location and the first exit location are one location.

**6.** The play apparatus of claim **1** further comprising a loading area, the loading area comprising an entry gate that allows entry to the second entry location and an exit gate that allows exiting from the second exit location.

**7.** The play apparatus of claim **1** further comprising a third type of equipment located under the common hub area.

**8.** The play apparatus of claim **7** wherein the third type of equipment comprises an obstacle course.

**9.** The play apparatus of claim **7** wherein the third type of equipment has portions located above the common hub area.

**10.** The play apparatus of claim **1** wherein:

a) the first type of elevated equipment comprises a ropes course;

b) the second type of equipment comprises a zip coaster;

c) a loading area, the loading area comprising an entry gate that allows entry to the second entry location and an exit gate that allows exiting from the second exit location;

d) a third type of equipment located under the common hub area.

**11.** The play apparatus of claim **1** wherein the common hub area is elevated above the ground at a single platform elevation.

**12.** A play apparatus, comprising:

a) a first type of elevated equipment, the first elevated equipment having a first user safety support that extends for a first traverse, the first user safety support elevated above the ground level, the first user safety support configured to receive a safety harness worn by a user and allowing the safety harness to move with the user along the first traverse, the first elevated equipment having a first entry location for the user to enter the first elevated equipment and a first exit location for the user to

exit the first elevated equipment;

b) a second type of elevated equipment, the second elevated equipment having a second user safety support that extends for a second traverse distance, the second user safety support elevated above the ground level, the second user safety support configured to receive the safety harness worn by the user, the second user safety support allowing the safety harness to move with the user along the second traverse, the second elevated equipment having a second entry location for the user to enter the second elevated equipment and a second exit location for the user to exit the second elevated equipment;

c) a common area elevated above the ground, the common area including the first entry location, the first exit location, the second entry location and the second exit location;

d) wherein the first type of elevated equipment is different than the second type of elevated equipment;

e) wherein the second type of elevated equipment comprises a zip coaster;

f) the zip coaster further comprises a rail;

g) further comprising a control device located on the rail and moveable between blocking and open positions, wherein when the control device is in the blocking position, forward movement of a trolley on the rail past the control device is stopped and when the control device is in the open position, forward movement of the trolley past the control device is allowed.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-2047

**Short Case Caption** UATP IP, LLC v. Kangaroo, LLC

**Filing Party/Entity** UATP IP, LLC and UATP Management, LLC

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/05/2022

Signature: /s/ Chris Hanslik

Name: Chris Hanslik

| **1. Represented Entities.**<br>Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.**<br>Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.**<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| UATP IP, LLC | | |
| UATP Management, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

Case: 22-2047 Document: 40 Page: 9 Filed: 08/04/2023



**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Andrew Pearce | BoyarMiller | |
| Molly Hust | BoyarMiller | |
| Alexandra Wolf | BoyarMiller | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ........................................................................ i
TABLE OF AUTHORITIES ........................................................................ vi
STATEMENT OF RELATED CASES ........................................................................ 1
JURISDICTIONAL STATEMENT ........................................................................ 2
COUNTERSTATEMENT OF THE ISSUES ........................................................................ 3
COUNTERSTATEMENT OF THE CASE ........................................................................ 4
I. UATP and Urban Air ........................................................................ 4
II. Air Entertainment Group ........................................................................ 6
III. Kangaroo ........................................................................ 7
IV. The Underlying Lawsuit ........................................................................ 7
V. Preliminary Injunction Request and Hearing ........................................................................ 8
VI. Post-Injunction Events ........................................................................ 10
SUMMARY OF THE ARGUMENT ........................................................................ 11
STANDARD OF REVIEW ........................................................................ 12
ARGUMENT ........................................................................ 13
I. The district court did not abuse its discretion in determining a substantial likelihood of success that UATP will succeed on the merits of its patent and trade dress infringement claims exists ........................................................................ 14
A. The district court did not commit clear error in finding UATP is likely to succeed on its patent infringement claim ........................................................................ 14
B. The district court did not abuse its discretion in finding UATP is likely to succeed on its trade dress infringement claim ........................................................................ 19
Functionality ........................................................................ 20

Inherent Distinctiveness and Secondary Meaning .........23

Likelihood of Confusion.................................................27

C. The district court did not abuse its discretion in restricting Kangaroo from using certain protected colors ..........................................................31

II. The district court did not abuse its discretion in determining UATP would suffer irreparable harm in the absence of an injunction ..........................................................................32

III. The district court balanced the equities and considered the public interest prior to granting the preliminary injunction................38

IV. The district court did not abuse its discretion in deciding not to impose a bond ..........................................................................40

CONCLUSION ..........................................................................................41

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.T.N. Indus., Inc. v. Gross*,
632 Fed. Appx. 185 (5th Cir. Dec. 7, 2015) ....................40

*Abraham v. Alpha Chi Omega,*
708 F.3d 614 (5th Cir. 2013) .................... 32, 33, 37, 38

*ADT, LLC v. Capital Connect, Inc.*,
145 F. Supp. 3d 671 (N.D. Tex. 2015) .................... 33, 35

*All. for Good Gov't v. Coal. for Better Gov't*,
901 F.3d 498 (5th Cir. 2018) ....................30

*AMID, Inc. v. Medic Alert Found. U.S., Inc.*,
241 F. Supp. 3d 788 (S.D. Tex. 2017)....................24

*Assoc. of Co-operative Members, Inc. v. Farmland Indus., Inc.*,
684 F.2d 1134 (5th Cir. 1982), *cert. denied*, 460 U.S. 1038 (1983) ....................21

*Bayer CropScience AG v. Dow AgroSciences LLC*,
851 F.3d 1302 (Fed. Cir. 2017) .................... 12, 34

*Bd. of Supervisors v. Smack Apparel Co.*,
550 F.3d 465 (5th Cir. 2008) ....................27

*Beatriz Ball, LLC v. Barbagallo Co., LLC*,
40 F.4th 308 (5th Cir. 2022) .................... 26, 31

*Canon, Inc. v. GCC Int'l Ltd.*,
263 Fed. Appx. 57 (Fed. Cir. Jan. 25, 2008) ....................37

*Chevron Chemical Co. v. Voluntary Purchasing Gps., Inc.*,
659 F.2d 695 (5th Cir. Unit A 1981) ....................22

*Daily Instruments Corp. v. Heidt*,
998 F. Supp. 2d 553 (S.D. Tex. 2014).................... 34, 35

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC*,
710 F.3d 579 (5th Cir. 2013) ....................14

*Elepreneurs Holdings, LLC v. Benson*,
2021 LEXIS 21978 (E.D. Tex. Feb. 5, 2021) .......... 38

*Emerald City Mgmt., L.L.C. v. Kahn*,
624 Fed. Appx. 223 (5th Cir. Dec. 11, 2015) .......... 33

*Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*,
628 F.2d 500 (5th Cir. 1980) .......... 30

*Hobbs v. Evo Inc.*,
7 F.4th 241 (5th Cir. 2021) .......... 13

*Ill. Tool Works, Inc. v. Grip-Pak, Inc.*,
906 F.2d 679 (Fed. Cir. 1990) .......... 15

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011) .......... 37

*Kaepa, Inc. v. Achilles Corp.*,
76 F.3d 624 (5th Cir. 1996) .......... 40

*Kellogg Brown & Root Servs. v. U.S.*,
728 F.3d 1348 (Fed. Cir. 2013) .......... 19

*La. World Exposition v. Logue*,
746 F.2d 1033 (5th Cir. 1984) .......... 29, 30

*LeMaire v. La.*,
480 F.3d 383 (5th Cir. 2007) .......... 17

*P&G v. Kraft Foods Global, Inc.*,
549 F.3d 842 (Fed. Cir. 2008) .......... 12

*Paulsson Geophysical Servs. v. Sigmar*,
529 F.3d 303 (5th Cir. 208) .......... 14

*Pebble Beach Co. v. Tour 18 I*,
155 F.3d 526 (5th Cir. 1998) .......... *passim*

*PIU Mgmt., LLC v. Inflatable Zone Inc.*,
2010 LEXIS 16868 (S.D. Tex. Feb. 25, 2010) .......... 35

*Polymer Techs., Inc. v. Bridwell*,
103 F.3d 970 (Fed. Cir. 1996) .......... 34

*Qingdao Taifa Gp. Co. v. U.S.*,
581 F.3d 1375 (Fed. Cir. 2009) ....................................................................14

*Quantum Fitness Corp. v. Quantum LifeStyle Ctrs., L.L.C.*,
83 F. Supp. 2d 810 (S.D. Tex. 1999)............................................................ 33, 39

*Ramada Franchise Sys. v. Jacobcart, Inc.*,
2001 LEXIS 6650 (N.D. Tex. May 17, 2001)....................................................39

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011) ....................................................................37

*Shuffle Master, Inc. v. Vendingdata Corp.*,
163 F. Appx. 864 (Fed. Cir. 2005) ...............................................................17

*Smith & Nephew, Inc. v. Arthrex, Inc.*,
2010 LEXIS 60356 (E.D. Tex. June 18, 2010) ..................................................38

*Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc.*,
74 F.3d 1216 (Fed. Cir. 1996) ......................................................................15

*Sparrow Bars & Events v. Ruth Farm, Inc.*,
2019 LEXIS 61515 (E.D. Tex. Apr. 10, 2019) ..................................................21

*Streamline Prod. Sys. v. Streamline Mfg.*,
851 F.3d 440 (5th Cir. 2017) ...................................................................... 29, 30

*Taco Cabana Int'l. v. Two Pesos, Inc.*,
932 F.2d 1113 (5th Cir. 1991), *aff'd* 505 U.S. 763 (1992)..........................*passim*

*Terex S.D. v. Sinoboom N. Am.*,
2021 LEXIS 191168 (S.D. Tex. Aug. 21, 2021).................................... 24, 25, 39

*Test Masters Educ. Servs., Inc. v. Robin Singh Educ. Servs., Inc.*,
799 F.3d 437 (5th Cir. 2015) ........................................................................25

*Tex. Commercial Energy v. TXU Energy, Inc.*,
413 F.3d 503 (5th Cir. 2005) ........................................................................17

*TGI Friday's, Inc. v. Great Nw. Rests., Inc.*,
652 F. Supp. 2d 763 (N.D. Tex. 2009) ................................................... 13, 33, 39

*T-Mobile US, Inc. v. Aio Wireless LLC*,
991 F. Supp. 2d 888 (S.D. Tex. 2014).................................................................39

*Toro Co. v. Deere & Co.*,
355 F.3d 1313 (Fed. Cir. 2004) ..................................................................... 16, 17

*TrafFix Devices, Inc. v. Mktg. Displays, Inc*.,
532 U.S. 23 (2001)........................................................................................... 20, 21

*Two Pesos, Inc. v. Taco Cabana, Inc*.,
505 U.S. 763 (1992)........................................................................... 19, 21, 23, 39

*TWTB, Inc. v. Rampick,*
152 F. Supp. 3d 549 (E.D. La. 2016)..................................................................28

*Ugine & ALZ Belgium v. U.S.*,
452 F.3d 1289 (Fed. Cir. 2006) ...........................................................................12

*Wal-Mart Stores, Inc. v. Samara Bros., Inc*.,
529 U.S. 205 (2000)........................................................................... 19-20, 23

*West Wind Africa Line, Ltd. v. Corpus Christi Marine Servs., Co.*,
834 F.2d 1232 (5th Cir. 1988) .............................................................................18

*Xtreme Lashes, LLC v. Xtended Beauty, Inc*.,
576 F.3d 221 (5th Cir. 2009) ............................................................. 27, 28, 29, 30

**Statutes and Other Authorities:**

15 U.S.C. § 1116(a) ..........................................................................................32

Fed. R. Civ. P. 12(b) ..............................................................................................8

Fed. R. Civ. P. 65(c)..............................................................................................40

## STATEMENT OF RELATED CASES

Plaintiffs-Appellees UATP Management, LLC and UATP IP, LLC (collectively "UATP") concur with Defendant-Appellant Kangaroo, LLC's statement of related cases.

## JURISDICTIONAL STATEMENT

UATP concurs with Kangaroo's jurisdictional statement.

## COUNTERSTATEMENT OF THE ISSUES

1. Whether the district court abused its discretion in granting the preliminary injunction where sufficient evidence established:
    (a) UATP is likely to succeed on the merits of its patent infringement and trade dress infringement claims;
    (b) UATP would suffer irreparable harm without a preliminary injunction; and
    (c) the balancing of equities and the public interest weighed in favor of a preliminary injunction.
2. Whether the district court abused its discretion by not requiring UATP to post a bond.

## COUNTERSTATEMENT OF THE CASE

This is an interlocutory appeal from the granting of a preliminary injunction based on patent and trade dress infringement claims entered in favor of UATP IP against Kangaroo. UATP Management franchises indoor trampoline and adventure parks called "Urban Air Adventure Park." Appx056. After former franchisee, Defendant Air Entertainment Group, LLC ("AEG"), abandoned the premises at which its Urban Air franchise was located, UATP terminated AEG's franchise agreement. Appx722-723. Shortly thereafter, Kangaroo began operating in the former AEG space an indoor trampoline park – Kangaroo Fun Zone – identical to its predecessor, Urban Air. Appx065-066. UATP subsequently sought and was granted by the Southern District of Texas a thoughtfully crafted preliminary injunction, which enjoined Kangaroo from infringing on UATP's patent and portions of its trade dress. Appx001-003. Kangaroo then filed this appeal.

### I. UATP and Urban Air

The first Urban Air opened in 2011. Appx616. There are approximately 160 Urban Air locations around the country. Appx058. UATP IP owns all intellectual property associated with the Urban Air brand, including, without limitation, Copyright Registration No. VA 2-096-749, which protects a drawing referred to as the "Slam Dunk" and Patent No. 10,702,729 B2 (the "Patent"), which protects a multi-level play equipment system commonly known as the "Adventure Hub."

Appx056, Appx493-514, Appx667, Appx694, Appx724-734, Appx771-773. This intellectual property is exclusively licensed to UATP Management (UATP IP's parent company) to be used for the benefit of Urban Air parks owned or franchised by UATP under written franchise agreements. Appx060-061, Appx610-611; *see* Appx0058 (explaining UATP owns only three parks).

To ensure uniformity across all Urban Air locations, UATP has invested substantial time and money developing and perfecting its well-known, easily identifiable brand. *See, e.g.*, Appx058-060, Appx626. UATP has gone to great lengths to differentiate itself from competitors by developing proprietary intellectual property and equipment for use in its parks and creating a look, feel, and experience unique to the Urban Air brand. *See* Appx056-057, Appx072-075, Appx493-514, Appx667, Appx694, Appx724-734, Appx771-773. Franchises across the country are required to install UATP's patented equipment and utilize its confidential information and protected trade dress to maintain this distinct look, feel, and experience. *See* Appx069, Appx753. This includes, for example, incorporating specific (i) colors schemes comprised of orange, yellow, Urban Air Lime Green, and Cosmic Dust Blue, (ii) lighting, (iii) attractions and activity options, (iv) signage (content, font, and color), (vi) white ball pits, and (vii) floor plans, layout, and schematics. Appx085, Appx614, Appx774. The parks are comprised of unique attractions such as ropes courses, battle beams, ninja warrior-like courses, zip lines,

climbing walls, and a patented play apparatus commonly referred to as the "Adventure Hub." Appx072-073. These attractions are located and arranged in a specific way that creates a unique and deliberate layout across all franchises. Appx084-086.

## II. Air Entertainment Group

In May 2016, AEG, which is owned by Defendants Dan Trinh, Hai Chanh Quach, and Raymond Hung and managed by Defendant Alan Trinh, executed a franchise agreement with UATP ("Franchise Agreement"). Appx058, Appx611. Under the Franchise Agreement, UATP issued to AEG a non-transferable license to use UATP's intellectual property, including patents, copyrights, trademarks, and trade dress. Appx058-060, Appx611. AEG's Urban Air franchise was located at 6310 McPherson Road, Laredo, Texas ("McPherson Property") – a property owned by Defendant Golden Star Group, Ltd. – an entity that shares common ownership with AEG. Appx611. AEG subsequently abandoned the lease premises with all equipment inside and defaulted under the Lease. *See* Appx579-595.

In January 2021, UATP terminated the Franchise Agreement thereby terminating and revoking any license or right AEG had to use UATP's intellectual property and confidential and proprietary information. UATP reminded AEG of its obligation to debrand. Appx722-723. Rather than debrand, after ceasing operations under AEG's name, AEG picked right back up where it left off, this time with the

help of Defendant Tina Luu (as the new owner of the McPherson Property) and/or Kangaroo (as the new lessee of the premises and operator of a competing trampoline park). Appx458, *see* Appx611.

## III. Kangaroo

In July 2021, Kangaroo opened Kangaroo Fun Zone at the McPherson Property – an indoor trampoline and adventure park identical to its predecessor, Urban Air. Appx065-066, Appx458. Making little to no modifications other than changing the facility's name from Urban Air to Kangaroo Fun Zone, Kangaroo used UATP's confidential vendors and incorporated all of the elements, equipment (including the copyrighted "Slam Dunk" and patented "Adventure Hub"), and layout that distinguishes an Urban Air facility from its competitors. Appx068-069, Appx084-086, Appx458, Appx611-612. Kangaroo also employed as its general manager Defendant Edgar Alejandro Guerrero – the same individual who served as the general manager for AEG's Urban Air. Appx068. None of the alleged changes made by Kangaroo did anything to alter the look, feel, or experience of the facility, thereby enabling Kangaroo to benefit and profit from Urban Air's hard-earned reputation and its unauthorized use of UATP's intellectual property and trade dress.

## IV. The Underlying Lawsuit

Because of the overwhelming similarities between Kangaroo Fun Zone and Urban Air, UATP filed suit against Kangaroo and the other Defendants for, *inter*

*alia*, patent, copyright, and trade dress infringement, misappropriation of trade secrets, and conspiracy. Appx212-240, Appx456-491. Almost immediately thereafter, AEG, Kangaroo, and Minh Tang (the sole owner of Kangaroo) began filing motions for extension of time to file their answers and 12(b) motions to dismiss. Appx008-012. In mid-February 2022, UATP's current counsel replaced UATP's former attorney. Appx013 at Dkt. Nos. 47-48. During this time, UATP sought discovery from Kangaroo and the other Defendants regarding ownership of the equipment in the McPherson Property – equipment previously used by AEG in operating its Urban Air franchise and currently unlawfully used by Kangaroo in operating Kangaroo Fun Zone. Appx102-104, Appx172-174. After receiving little information in response to its discovery requests, UATP, in good faith, tried to work with defendants to obtain responsive information so it could make the important determination of who owned the equipment and identify what interrelationships between or among the parties existed. Appx102-104, Appx172-174. Also around this time, according to Kangaroo, it "began making substantial modifications to its park." Opening Br. at 4-5 (citing Appx114, Appx116).

## V. Preliminary Injunction Request and Hearing.

In April 2022, the parties participated in site visits – first of an Urban Air franchise in Katy, Texas and then of Kangaroo Fun Zone in Laredo. Appx071-072. To UATP's surprise, the "substantial modifications to its park" allegedly made by

Kangaroo were at best temporary and minimal and did nothing to alter the overall look, feel, or experience of the facility. Appx072, Appx113-114, Appx634-653. Pictures taken during these site visits exhibit the undeniable and still-remaining similarities between Kangaroo Fun Zone and its predecessor Urban Air. Appx634-653. After these site visits, UATP was left with no choice but to pursue injunctive relief.

Prior to seeking injunctive relief, and as a result of Defendants' failures to cooperate during discovery, UATP filed a Second Amended Complaint to ensure all persons and entities that could conceivably assert an ownership interest over the equipment in the McPherson Property were added as parties to the suit. *See* Appx456-491. Days later, the district court set UATP's request for injunctive relief for a hearing on June 9, 2022. Appx014 at Dkt. No. 63. The following day, Kangaroo sought an opposed continuance of the hearing. Appx014 at Dkt. No. 66. In response, the court pushed the hearing two weeks out. Appx015 at Dkt. No. 68.

On June 24, 2022, the district court conducted an evidentiary hearing on UATP's preliminary injunction request. Appx015 at Dkt. No. 75. After hearing testimony from two witnesses – Stephen Polozola on behalf of UATP and Stanley Tang on behalf of Kangaroo – and weighing the evidence, on June 28, 2022, the district court entered a preliminary injunction in favor of UATP. Appx001-003, *see generally* Appx043-211. The court correctly found that UATP was likely to succeed

on the merits of its patent and trade dress infringement claims and that Kangaroo's infringing conduct inflicted irreparable harm upon UATP. The court also considered the public interest and appropriately balanced the harm between the parties.

## VI. Post-Injunction Events

Weeks after the court entered the preliminary injunction, UATP discovered Kangaroo Fun Zone looked exactly the same as it did during the April 2022 site visit. Appx788, Appx794-819. Kangaroo was still using the patented "Adventure Hub" and UATP's protected trade dress remained prevalent throughout the facility. *See* Appx801-811. In other words, despite sworn testimony at the preliminary injunction hearing from Kangaroo regarding significant modifications allegedly made to the facility, Kangaroo Fun Zone continued to be a carbon copy of its predecessor Urban Air, this time in clear violation of the preliminary injunction. *See* Appx113-117. Side-by-side pictures of the Katy Urban Air and Kangaroo Fun Zone as of July 7, 2022 offer incontrovertible proof of these violations. Appx794-811. As a result, UATP filed a motion for contempt and sanctions against Kangaroo. Appx787-822. On the same day, Kangaroo filed its notice of appeal. Appx016 at Dkt. No. 84. Even though Kangaroo did not file a response to UATP's contempt motion or a motion seeking a stay of the preliminary injunction, on July 14, 2022, the district court entered a management order, sua sponte, staying UATP's contempt motion pending appeal. Appx016 at Dkt. No. 87. To this day, UATP is unable to enforce the

preliminary injunction, leaving Kangaroo free to continue infringing on UATP's intellectual property and protected trade dress, while Kangaroo benefits financially from such infringement and harms Urban Air's hard-earned goodwill and reputation without recourse.

At the end of August, Kangaroo filed a still pending motion to modify or alternatively stay the preliminary injunction. Appx826-835. Despite claiming to have undertaken "substantial efforts to comply with the preliminary injunction" making "Kangaroo's overall look and feel [] distinct from that of Urban Air," the photographs relied upon by Kangaroo as support for this alleged distinctiveness actually reinforce the basis for the preliminary in the first place – the continued similarities in the look, feel, and experience between Kangaroo Fun Zone and Urban Air. Appx829, Appx831, Appx840-851; *see* Appx634-653. Kangaroo sought permission to continue infringing on UATP's protected equipment and trade dress because additional changes would be too costly and "require funds it does not have." Appx830. To this day and to UATP's detriment, Kangaroo continues to trade on Urban Air's hard-earned reputation without consequence.

## SUMMARY OF THE ARGUMENT

The district court did not err or abuse its discretion in granting the preliminary injunction at issue. UATP provided sufficient evidence to support each of the four

required factors for injunctive relief. This Court should therefore affirm the trial court's granting of the preliminary injunction.

## STANDARD OF REVIEW

The decision to grant or deny a preliminary injunction is within the sound discretion of the district court based upon the assessment of four factors: (1) likelihood of success on the merits; (2) irreparable harm in the absence of injunctive relief; (3) balance of hardships; and (4) public interest. *P&G v. Kraft Foods Global, Inc.*, 549 F.3d 842, 847 (Fed. Cir. 2008). No one factor is dispositive – the weakness of the showing of one factor may be overborne by the strength of others. *Ugine & ALZ Belgium v. U.S.*, 452 F.3d 1289, 1292-93 (Fed. Cir. 2006) (citation omitted).

An appellate court may reverse the district court's decision only if the district court has committed an abuse of discretion. *Kraft Foods*, 549 F.3d at 846. Abuse of discretion is a highly deferential standard of review. *Bayer CropScience AG v. Dow AgroSciences LLC*, 851 F.3d 1302, 1306 (Fed. Cir. 2017). "[D]eference to the trial court is the hallmark of abuse-of-discretion review." *Id.* To meet this standard, the moving party must show the district court has made a clear error of judgment in weighing relevant factors or basing its decision on an error of law or on clearly erroneous factual findings. *Id.* Findings of fact that support the district court's decision are examined for clear error. *Id.* A factual finding is clearly erroneous only if, based on the entire record, the Court is left with the definite and firm conviction

that a mistake has been committed. *Hobbs v. Evo Inc.*, 7 F.4th 241, 247 (5th Cir. 2021). Thus, when the district court's account of the evidence is plausible, reversal is improper even if the reviewing court would have weighed the evidence differently. *Id.* at 247-48 (citation omitted).

## ARGUMENT

In the underlying lawsuit, UATP has asserted seven claims against Kangaroo. Appx456-491. UATP's request for injunctive relief was based on three of those claims: (1) Trade Dress Infringement; (2) Patent Infringement; and (3) Copyright Infringement. Appx612. However, sufficient evidence of a substantial likelihood of success on just one of UATP's claims is sufficient to support a preliminary injunction. *TGI Friday's, Inc. v. Great Nw. Rests., Inc.,* 652 F. Supp. 2d 763, 767 (N.D. Tex. 2009) (explaining that a likelihood of success on a single claim that warrants injunctive relief is sufficient to support a preliminary injunction). Thus, even though UATP established a substantial likelihood of success on all three of its claims, the district court would still have acted well within its discretion in entering a preliminary injunction if a substantial likelihood of success on the merits was established for only one of the claims.

## I. The district court did not abuse its discretion in determining a substantial likelihood of success that UATP will succeed on the merits of its patent and trade dress infringement claims exists.

A finding of a likelihood of success is a fact finding reviewed for clear error. *Paulsson Geophysical Servs. v. Sigmar*, 529 F.3d 303, 306 (5th Cir. 208). A party seeking an injunction need only to demonstrate a fair chance of success on the merits, but need not prove it is entitled to summary judgment. *Qingdao Taifa Gp. Co. v. U.S.*, 581 F.3d 1375, 1381 (Fed. Cir. 2009); *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013). Here, the district court did not commit clear error in finding a likelihood of success on UATP's patent or trade dress infringement claims.

### A. The district court did not commit clear error in finding UATP is likely to succeed on its patent infringement claim.

Kangaroo claims the district court committed reversible error with respect to UATP's patent infringement claim for two reasons: (1) failing to perform a claim construction; and (2) ignoring "sworn and unrefuted testimony that Kangaroo dismantled anything that allegedly resembled" UATP's patented equipment. Opening Br. at 14-15. However, and as impliedly recognized by Kangaroo, claim construction is not always required at the preliminary injunction stage. Opening Br. At 15 ("[A] correct claim construction is *almost* always a prerequisite for imposition of a preliminary injunction.") (citation omitted) (emphasis added). The district court does not have an obligation "to conclusively interpret claims at an early stage in

a case. A trial court may exercise its discretion to interpret the claims at a time when the parties have presented a full picture of the claimed invention and prior art." *Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1221 (Fed. Cir. 1996) (citing *Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 681 (Fed. Cir. 1990)). This is a case in which claim construction is not required at this early stage.

Kangaroo argues UATP's likelihood of success on its patent infringement claim turns most importantly on the meaning of "common area hub" and reversal is required because the "district court neglected to construe, analyze, or explain" the meaning of this phrase. Opening Br. at 17-18. However, not only does the Patent's language sufficiently describe the meaning of the phrases about which Kangaroo complains and its illustrations adequately depict the protected elements but, in addition, there is no dispute as to what equipment is patented. *See* Appx671-692. Kangaroo's own witness clearly understood what equipment is patent protected when he testified about how Kangaroo's modifications allegedly ceased any infringement. Appx115-117, Appx836-839; *see* Opening Br. at 18-19 (citing Appx115-116).

On the one hand, Kangaroo wants this Court to overturn the district court's injunction based on the lack of descriptions for simple and commonly used terms. Opening Br. at 16-18. Yet, on the other hand, Kangaroo asks this Court to consider "sworn and unrefuted testimony" regarding alleged changes made by Kangaroo to

"The Hub." Opening Br. at 18-19. If there was some dispute as to the meaning of "The Hub" or what the Patent covered, Kangaroo would be unable to identify or testify about what changes were necessary to cease infringement. *See, e.g.*, Appx829, Appx831, Appx836-837.

More, Kangaroo makes no attempt to show that the Patent could be construed in a way that would exclude "The Hub," ropes course, zip-line/zip coaster, and/or platforms and elevated walkways as they exist at Kangaroo Fun Zone. This failure is sufficient to affirm the district court's finding of likelihood of success on the merits of UATP's patent infringement claim. *See Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1322 (Fed. Cir. 2004) (affirming district court's infringement ruling because alleged infringer "has not even attempted to show that claim 1 could be construed in a way that would exclude the" patented embodiments).

Kangaroo distractingly focuses on terminology used by UATP's witness to describe his understanding of what is covered by the Patent. Opening Br. at 7-8, 16-17. For example, Kangaroo focuses on the witness's description of the patented technology as "the combination of the zip-line, ropes course, and a 'Soft Playground' (unmentioned in the patent)." Opening Br. at 16. However, the way in which UATP's witness describes the patented technology has no bearing on what equipment is protected by the Patent, UATP's likelihood of success on the merits of its patent infringement claim, or any analysis of the same. The unambiguous

language of the Patent along with the illustrations included therein provide clear instruction on what is protected. When coupled with Kangaroo's undisputed use of the "Adventure Hub," the district court did not need to conduct an explicit claim construction. *See Toro*, 355 F.3d at 1322. There is simply no reasonable ground for dispute as to the claim meaning.

Even assuming, *arguendo*, the district court was required to undertake a claim construction (it was not), Kangaroo's failure to raise this argument to the district court prohibits it from doing so now. *LeMaire v. La.*, 480 F.3d 383, 387 (5th Cir. 2007) (citing *Tex. Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503, 510 (5th Cir. 2005) ("[A]rguments not raised before the district court are waived and cannot be raised for the first time on appeal."). At no point in its briefing opposing UATP's request for injunctive relief or during the injunction hearing nor in any pleading subsequently filed in the district court did Kangaroo complain about an alleged need for or lack of a claim construction. Appx702-711, Appx783-785, Appx826-835; *see generally* Appx043-211. Kangaroo should therefore not be permitted to raise a claim construction issue now, at the appellate level, where it failed to previously raise any issue that would necessitate the district court to perform a claim construction. *LeMaire*, 480 F.3d at 387; *cf. Shuffle Master, Inc. v. Vendingdata Corp.*, 163 F. Appx. 864, 867 (Fed. Cir. 2005) (holding claim construction argument was preserved for appeal where appellant "featured its claim construction argument in its

papers in opposition to the preliminary injunction" and, in its motion to the district court for a stay of the injunction, complained the district court "did not analyze any specific claim or claim element of the patent" then re-urged the same issue in its reply brief).

Kangaroo also claims the district court "ignored sworn and unrefuted testimony that Kangaroo dismantled anything that allegedly resembled a 'hub' from its equipment." Opening Br. at 14-15. However, not only does the record contain evidence disputing these assertions, but also, it is within the trial court's purview to weigh Kangaroo's testimony and assess the credibility of its witness. *See* Appx787-819. With Kangaroo offering nothing more than thin testimony regarding alleged changes made to "The Hub," it was within the district court's sound discretion to find Kangaroo "did not have sufficient evidence at the hearing to show how it eliminated the patented characteristic" and therefore, to determine UATP was likely to succeed on the merits of its patent infringement claim. *See West Wind Africa Line, Ltd. v. Corpus Christi Marine Servs., Co.*, 834 F.2d 1232, 1235 (5th Cir. 1988) (An appellate court "must give deference to the trial court, for it is the trial court's province to weigh the evidence and assess the credibility of witnesses. The trial court chose to credit the testimony offered by [plaintiff] and accepted its version of the facts. That choice is the essence of the decisional process, and we cannot say that that decision was wrong merely because there was evidence to the contrary.");

*Kellogg Brown & Root Servs. v. U.S.*, 728 F.3d 1348, (Fed. Cir. 2013) (citation omitted) ("[I]n reviewing factual findings under the clear error standard, this court gives great deference to the [trial] court's decisions regarding credibility of witnesses.")

### B. The district court did not abuse its discretion in finding UATP is likely to succeed on its trade dress infringement claim.

Kangaroo claims the district court erred in four areas when determining UATP is likely to succeed on its trade dress claim: (1) functionality of equipment, (2) secondary meaning, (3) likelihood of confusion, and (4) expansiveness of enjoined colors. Opening Br. at 19-20. Because the district court committed no clear error, this Court should affirm the trial court's order.

"Trade dress refers to the total image and overall appearance of a product and may include features such as the size, shape, color, color combinations, textures, graphics, and design." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764–65 n. 1 (1992). It encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer. *Id.* at 763. The purpose of trade dress protection is to secure the goodwill of the subject business and to protect the ability of consumers in the relevant market to distinguish among competing products. *Id.*

To be protectable, the trade dress must be: (1) inherently distinctive or have acquired secondary meaning, and (2) nonfunctional. *Wal-Mart Stores, Inc. v.*

*Samara Bros., Inc*., 529 U.S. 205, 210-11 (2000). With trade dress, the question is "whether the combination of features creates a distinctive visual impression, identifying the source of the product." *Pebble Beach Co. v. Tour* 18 I, 155 F.3d 526, 536 (5th Cir. 1998) (citation omitted).

UATP's protected trade dress includes the neon orange, yellow, Urban Air Lime Green, and Cosmic Dust Blue color scheme prevalent throughout Urban Air franchises, attractions and activity options, floor plans, layout, schematics, signage (content, lettering, and coloring), and white ball pits. ("Trade Dress"). Appx058-060, Appx084-086, Appx614; *see Pebble Beach,* 155 F.3d at 539 (stating that color alone can meet the basic legal requirements for use as a trademark).

*Functionality*

Despite Kangaroo's unsupported allegations to the contrary, the district court did not commit clear error in determining UATP's trade dress is nonfunctional. Opening Br. at 19, 23; *see Pebble Beach,* 155 F.3d at 536 ("The functionality … of trade dress … [is] a question[] of fact."). A product feature is functional if: (1) it is essential to the use or purpose of the article, (2) it affects the cost or quality of the article, or (3) plaintiff's exclusive use of the design would inhibit competition. *TrafFix Devices, Inc. v. Mktg. Displays, Inc*., 532 U.S. 23, 32-33 (2001). In other words, a product feature is functional if it is "the reason the device works" or its exclusive use would put competitors at a significant non-reputation-related

disadvantage. *Id*. at 33-34. In contrast, non-functional features are those that are arbitrarily affixed or included for aesthetic purposes. *Id.* at 34.

To obtain trade dress protection, a party need not show that each individual component of its asserted trade dress is non-functional. *Sparrow Bars & Events v. Ruth Farm, Inc.,* 2019 LEXIS 61515, *19 (E.D. Tex. Apr. 10, 2019) (citing *Taco Cabana Int'l. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119 (5th Cir. 1991) *aff'd,* 505 U.S. 763 (1992)) (Although functional features cannot be protected as trade dress, "a particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection."). An arbitrary combination of functional features properly enjoys trade dress protection. *Two Pesos, Inc.*, 932 F.2d at 1118 ("The instructions properly cautioned the jury not to focus on isolated components in determining the protectability of Taco Cabana's trade dress, but rather to consider the overall combination of elements."), *aff'd,* 505 U.S. 763 (1992); *Assoc. of Co-operative Members, Inc. v. Farmland Indus., Inc.*, 684 F.2d 1134, 1140 (5th Cir. 1982), *cert. denied*, 460 U.S. 1038 (1983) ("The whole, in trademark law, is often greater than the sum of its parts.").

UATP's Trade Dress consists of arbitrary and fanciful design elements that serve no function, are not essential to the use or purpose of the product, do not affect the cost or quality of the product, and do not place competitors like Kangaroo Fun Zone, if prohibited from copying UATP's Trade Dress, at a non-reputation related

disadvantage. *See* Appx058-059, Appx072, Appx084-086, Appx089-090, Appx092-093. For example, UATP could have selected a color scheme other than neon orange, yellow, Urban Air Lime Green, and Cosmic Dust Blue or chosen a different layout for its facilities and still be able to operate an indoor trampoline park. UATP's use of ball pits with white balls and the theme of their three climbing walls are for design and stylistic purposes only. UATP could operate an indoor trampoline park with different color balls and climbing walls with different themes or could operate without balls, a ball pit, or climbing walls.

More, Kangaroo Fun Zone can utilize many different combinations of color schemes, layouts, attractions, and signage without infringing on UATP's Trade Dress. *Two Pesos*, 932 F.2d at 1119 ("Taco Cabana's particular integration of elements leaves a multitude of alternatives to the upscale Mexican fast-food industry that would not prove confusingly similar to Taco Cabana's trade dress."); *Chevron Chemical Co. v. Voluntary Purchasing Gps., Inc.*, 659 F.2d 695, 703 (5th Cir. Unit A 1981) (protecting a "combination of particular hues of [plaintiff's] colors, arranged in certain geometric designs, presented in conjunction with a particular style of printing . . . would leave innumerable other combinations of the same colors . . .").

*Inherent Distinctiveness and Secondary Meaning*

Despite Kangaroo's contentions to the contrary, a showing of secondary meaning is not required in this case. *See* Opening Br. at 21. Rather, a showing of inherent distinctiveness is all that is needed. *See, e.g., Two Pesos,* 505 U.S. at 767 (holding trade dress that is inherently distinctive is protectable without showing secondary meaning); *Wal*-Mart, 529 U.S. at 215 (confirming that product packaging can be inherently distinctive). UATP's Trade Dress, including the arrangement and flow of Urban Air franchises, is akin to the restaurant decor (and protected trade dress) addressed in *Two Pesos*:

> a festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals. The patio includes interior and exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors. The stepped exterior of the building is a festive and vivid color scheme using top boarder paint and neon stripes. Bright awnings and umbrellas continue the theme.

*Two Pesos*, 505 U.S. at 765. According to the United States Supreme Court:

> [T]he decor of a restaurant, seems to us not to constitute product *design*. It was either product packaging—which, as we have discussed, normally *is* taken by the consumer to indicate origin—or else some *tertium quid* that is akin to product packaging and has no bearing on the present case.

*Wal-Mart*, 529 U.S. at 215 (emphasis included). Establishing inherent distinctiveness may be achieved by proving the intrinsic nature of the trade dress

serves to identify a particular source. *AMID, Inc. v. Medic Alert Found. U.S., Inc.*, 241 F. Supp. 3d 788, 801-02 (S.D. Tex. 2017).

Here, UATP's Trade Dress is arbitrary and fanciful and is for design and stylistic purposes only. *Pebble Beach*, 155 F.3d at 540 (stating trade dress with these classifications are inherently distinctive and do not require a showing of secondary meaning). With trade dress, the question is "whether the combination of features creates a distinctive visual impression, identifying the source of the product." *Pebble Beach*, 155 F.3d at 536 (5th Cir. 1998) (citation omitted); *Taco Cabana Int'l*, 932 F.2d at 1120 ("[T]he existence of [non-distinctive] elements does not eliminate the possibility of inherent distinctiveness in the trade dress as a whole."). The unique combination of UATP's (protectable) Trade Dress creates the look, feel, and experience consumers associate with Urban Air. In fact, notwithstanding the alleged overwhelming modifications to the facility by Kangaroo, consumers still associate the look, feel, and experience of Kangaroo Fun Zone with Urban Air. *See, e.g.*, Appx656; *Terex S.D. v. Sinoboom N. Am.*, 2021 LEXIS 191168, at *32 (S.D. Tex. Aug. 21, 2021) ("[A] defendant cannot defeat a claim of trademark infringement by pointing to other, dissimilar aspects of the trade dress, particularly when the trade dress is dominated by the color mark at issue.").

Even if a showing of secondary meaning is required (it is not), UATP offered sufficient evidence to establish same. Whether trade dress has acquired secondary

meaning is a question of fact reviewed on appeal for clear error. *Pebble Beach*, 155 F.3d at 537. Courts weigh seven factors when determining whether a mark has acquired secondary meaning:

> (1) length and manner of use of the mark or trade dress; (2) volume of sales; (3) amount and manner of advertising; (4) nature of use of the mark or trade dress in newspapers and magazines; (5) consumer-survey evidence; (6) direct consumer testimony; and (7) the defendant's intent in copying the mark.

*Test Masters Educ. Servs., Inc. v. Robin Singh Educ. Servs., Inc.*, 799 F.3d 437, 445 (5th Cir. 2015).

While UATP acknowledges no consumer-survey evidence exists in the record, UATP has otherwise presented sufficient evidence of secondary meaning. *See Terex*, 2021 LEXIS 191168, at *25 (finding that notwithstanding the lack of consumer-survey evidence presented, making this factor neutral, the following weighed in favor of a finding of secondary meaning: long-term use of the mark and incorporation of the mark online and in various video and magazine advertisements).

UATP has been using its Trade Dress uninterrupted since 2011 when the first Urban Air opened. Appx616-617, Appx632. The average park sales volume from consumers' use of UATP's protected and proprietary features is $2.8 million annually. Appx617, Appx632. UATP spends millions of dollars annually on marketing and advertising the Urban Air brand and franchise through numerous outlets including online, through social media platforms, via email, on television,

and through various other digital channels. Appx617, Appx632. These marketing and advertisement efforts include images of and information about, for example, UATP's protected color scheme, attractions, lighting, mascot, café, party rooms, and pricing packages. Appx617, Appx632. Consumers associate these features with Urban Air franchises. *See, e.g.*, Appx655-658. Kangaroo has confusingly and without authorization used in its marketing and advertising to promote Kangaroo Fun Zone the same images Urban Air uses in its advertising efforts. Appx660-665; *see Beatriz Ball, LLC v. Barbagallo Co., LLC*, 40 F.4th 308, 320 (5th Cir. 2022) ('[E]vidence of deliberate copying can be a weighty factor if it appears the copying attempted to benefit from the perceived secondary meaning").

The stark similarities between Urban Air and Kangaroo Fun Zone and Kangaroo's outright use of Urban Air's protected features permit an inference of intent and further weigh in favor of secondary meaning. *Id.* ("[A] visual comparison of [the alleged infringer's] products to the [mark owner's products] makes it difficult to deny that there was intent to copy. The designs are not just alike, they are indistinguishable in some cases. When two product designs are so very similar, an inference of intent is permissible."). Based on sufficient evidence showing distinctiveness of UATP's Trade Dress, the district court did not commit clear error.

*Likelihood of Confusion*

The likelihood of confusion is a question of fact reviewed for clear error. *Pebble Beach,* 155 F.3d at 537. Courts examine the following non-exhaustive "digits of confusion" in evaluating likelihood of confusion:

> (1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers.

*Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009). "No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors." *Bd. of Supervisors v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008). The digits may weigh differently from case to case, depending on the particular facts and circumstances involved. *Xtreme Lashes,* 576 F.3d at 226.

Kangaroo overstates the district court's order with respect to the following statement: "Questions by customers about the new trampoline park that suggest similarities between Urban Air and Kangaroo do not necessarily imply confusion." Appx003; *see* Opening Br. at 23. Referring to this statement from the district court, Kangaroo argues "on this record, the court found there is not even an inference or implication of confusion." Opening Br. at 23. First, the court's statement (which does not support the broad generalizations attributed to it by Kangaroo) relates to a single piece of evidence – a screenshot of an individual asking whether Kangaroo

will have a zip line just like Urban Air. Appx746. While "not necessarily imply[ing] confusion," the district court found this evidence "evince[s] similarities that harm Urban Air" – a factor that supports a likelihood of confusion. Appx003; *see Xtreme Lashes*, 576 F.3d at 226 (identifying mark and product similarities as digits of confusion).

Second, UATP introduced additional photographic and other evidence of the overwhelming similarities between Kangaroo Fun Zone and Urban Air – evidence the district court found was sufficient to establish a likelihood of success on the merits. Appx002-003, Appx634-665; *see TWTB, Inc. v. Rampick,* 152 F. Supp.3d 549, 574 (E.D. La. 2016) ("The Court has also reviewed the photographs showing the interior and exterior of the restaurant before and after the termination of the License Agreement and also finds that the two are almost indistinguishable. Looking specifically to the items that LRSBR contends constitute its trade dress, the surfboards and surfer-related decorative items, the vast majority of these items have remained following the termination of the License Agreement. Therefore, the Court finds that the similarity of the trade dress weighs strongly in favor of a likelihood of confusion.").

Third, the district court made numerous other findings that support a finding of a likelihood of confusion:

- At the preliminary injunction hearing, Urban Air showed that Kangaroo is using its signature colors, safety warnings, and park layout and attractions.

- Kangaroo's witness testified at the preliminary injunction that he posted a statement on social media that alluded to the similarities between Urban Air and Kangaroo.

- Kangaroo substantially imitated Urban Air's total image by using the same colors, attraction structures, and park layout.

- Urban Air has substantial evidence that it was harmed through side-by-side photos demonstrating similarities.

- [Urban Air] also provides social media posts of customers asking whether Kangaroo is in the same location and provides similar membership pricing.

Appx002-003; *see* Appx634-665.

Although a showing of actual confusion is not mandatory, it is nonetheless the best evidence of likelihood of confusion. *La. World Exposition v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984) (citation omitted). A party need only provide very little proof of actual confusion to prove likelihood of confusion and may use anecdotal instances of consumer confusion to do so. *Streamline Prod. Sys. v. Streamline Mfg.*, 851 F.3d 440, 457 (5th Cir. 2017). "Even if anecdotes are minor and isolated, 'courts may not ignore competent evidence of actual confusion.'" *Id.* (quoting *Xtreme Lashes*, 576 F.3d at 230). A district court's finding of a likelihood of confusion can be supported by a single known incident of actual confusion. *Id.* Here, the record supports multiple instances of actual confusion. Appx655-658. By contrast,

Kangaroo offered no proof refuting such evidence. *Streamline Prod. Sys.*, 851 F.3d at 457 (citing *Xtreme Lashes,* 576 F.3d at 230)) ("[I]f the plaintiff provides proof of actual confusion, the defendant must provide an almost overwhelming amount of proof to refute such proof."). This alone is sufficient to support the district court's finding of a likelihood of customer confusion. *Id.* (citing *Logue,* 746 F.2d at 1041).

Even though the evidence discussed above is sufficient to affirm the district court's finding, the record contains additional evidence that supports its finding. *See, e.g.,* Appx523-533, Appx633-653, Appx659-665, Appx746. UATP also offered sufficient evidence of digits of confusion other than similarity of marks and actual confusion. For example, Kangaroo and Urban Air offer the exact same services – both are indoor trampoline parks – and target the same market and customer base – families. "'The greater the similarity between the products and services, the greater the likelihood of confusion.'" *All. for Good Gov't v. Coal. for Better Gov't,* 901 F.3d 498, 512 (5th Cir. 2018) (quoting *Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980)). Both Kangaroo and Urban Air use social media and the internet to advertise. *Exxon Corp.,* 628 F.2d at 506 ("The greater the similarity in the campaigns, the greater the likelihood of confusion."). Kangaroo has even used photographs of UATP's intellectual property and protected Trade Dress in marketing efforts and advertisements on its website and social media pages. Appx660-665. Because Kangaroo uses photographs of UATP's Trade Dress in its

advertising and marketing efforts, consumers are likely to think some affiliation with Urban Air exists when in fact, there is none.

Given the overwhelming similarities between Kangaroo and Urban Air, an inference of intent is permissible. *Beatriz Ball,* 40 F.4th at 317. Kangaroo was aware that an Urban Air franchise was operated at the McPherson Property shortly before it occupied the premises – all Urban Air equipment remained unaltered inside the facility and apparently the same families that operated the Urban Air at the McPherson Property own Kangaroo Fun Zone. Appx065-066, Appx069-070, Appx072, Appx081-082, Appx164. By doing little more than covering up with glue and staples explicit references to Urban Air, Kangaroo chose to use UATP's Trade Dress and benefit from the look, feel, and experience UATP spent substantial time developing and perfecting. *See* Appx696-700; *Ball,* 40 F.4th at 319 (citation omitted) (The "relevant inquiry is whether [the infringer] intended to derive benefits from [the mark owner]'s reputation by using the [trade dress]."); *Two Pesos*, 932 F.2d at 1122 ("The issue is not whether consumers can read signs and menus that identify different restaurants, but whether consumers assume some affiliation between Taco Cabana and Two Pesos.").

### C. The district court did not abuse its discretion in restricting Kangaroo from using certain protected colors.

The district court enjoined Kangaroo from using "neon orange, yellow, Urban Air Lime Green, and Cosmic Dust Blue in its facility or on social media, waivers,

and advertisements." Appx003. Kangaroo claims such restrictions overreach and lack evidentiary support. Opening Br. at 24. This is simply incorrect. UATP's witness testimony plus an exhibit offered by Kangaroo at the preliminary injunction hearing clearly identify the unique colors, which, when combined, constitute UATP's protected Trade Dress. Appx086 (orange, black, and yellow), Appx774 (Pegasus White, Cosmic Dust Blue, Urban Air Lime Green, Urban Air Black, Cool Charcoal), Appx827; *see Pebble Beach*, 155 F.3d at 539 (stating that color alone can meet the basic legal requirements for use as a trademark). Based on the evidence, the district court was well within its discretion to enjoin use of each of these colors.

## II. The district court did not abuse its discretion in determining UATP would suffer irreparable harm in the absence of an injunction.

The district court acted well within the scope of its broad discretion in determining UATP had and would continue to experience irreparable harm in the absence of an injunction. As the district court correctly held, UATP is entitled to a rebuttable presumption of irreparable harm. Appx003 (citing 15 U.S.C. § 1116(a)). This presumption acknowledges that the loss of control over reputation of goodwill by the mark owner is difficult to quantify and that monetary damages cannot compensate the mark owner for the injury sustained by infringement. *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013) (finding irreparable injury and noting that McCarthy's leading trademark law "treatise states, '[T]here seems little doubt that money damages are 'inadequate' to compensate [owner] for continuing

acts of [infringer]'"); *Emerald City Mgmt., L.L.C. v. Kahn*, 624 Fed. Appx. 223, 224 (5th Cir. Dec. 11, 2015) ("The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of [infringer's] goods").

When, as here, a likelihood of confusion exists, a mark owner's lack of control over the quality of the infringer's goods or services constitutes an immediate and irreparable injury, regardless of the actual quality of those goods or services. *Abraham*, 708 F.3d at 627 (recognizing the unique nature of harm caused by trademark infringement); *TGI Friday's,* 652 F. Supp. 2d at 772; *Quantum Fitness Corp. v. Quantum LifeStyle Ctrs., L.L.C.*, 83 F.Supp.2d 810, 831 (S.D. Tex. 1999).

Based on Kangaroo's design and method of operation, the public is left with a false impression that Kangaroo is either connected to or affiliated with UATP's business when it is not. Any such inference erodes UATP's marks and control over its own reputation. More, because UATP is unable to control Kangaroo's use of its Trade Dress, UATP is powerless to control Urban Air's reputation and place in the market without an injunction. *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 696 (N.D. Tex. 2015) (considering the loss of control of reputation and place in the market to constitute irreparable harm).

The presumption of irreparable harm acts "as a procedural device which places the ultimate burden of production on the question of irreparable harm onto

the alleged infringer." *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996). In other words, Kangaroo was required to proffer evidence sufficient to establish that UATP would not be irreparably harmed without an injunction. In an attempt to satisfy this burden, Kangaroo makes two arguments: (1) UATP's alleged delay in seeking a preliminary injunction necessarily establishes no irreparable harm and (2) money damages can compensate UATP for any harm. Opening Br. at Sec. II. When giving the trial court's findings significant deference, as an appellate court must do, it is clear the court did not abuse its direction in finding irreparable harm. *Polymer,* 103 F.3d at 973 (reviewing decision on whether presumption of irreparable harm is rebutted for abuse of discretion); *see Bayer*, 851 F.3d at 1306 ("[D]eference to the trial court is a hallmark of abuse-of-discretion review.").

Kangaroo focuses most of its lack of irreparable harm argument on UATP's alleged delay in seeking a preliminary injunction. Opening Br. at Sec. II (alluding to a delay being dispositive on the issue). However, and as seemingly acknowledged by Kangaroo, delay is *one* factor, but not the only factor, in determining whether there is irreparable harm. *Id.* at 25. Importantly, delay will not negate a finding of irreparable harm where the movant has a good explanation. *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 570 (S.D. Tex. 2014). A good explanation is exactly what the district court found here. *See* Appx003.

Kangaroo argues the delay clock should start from the time UATP filed the underlying suit. Opening Br. at 26. However, any alleged delay should be calculated from the date of the event necessitating UATP's pursuit of its request for injunctive relief – the site visit on April 13, 2022. Appx071-072, Appx537-559, Appx621, Appx634-653. UATP sought injunctive relief less than two months after this site visit. *See* Appx014 at Dkt. No. 63. None of Kangaroo's cited cases denied injunctive relief or overturned a lower court's order based on a short, less than two-month delay. *See* Opening Br. at 25-26; Appx705-707. More, courts in the Fifth Circuit have accepted delays of several months or more. *See, e.g., ADT*, 145 F. Supp. 3d at 698-99 (finding eight-month delay did not impact irreparable harm when plaintiff was investigating the claims in good faith); *PIU Mgmt., LLC v. Inflatable Zone Inc.*, 2010 LEXIS 16868, at *7 (S.D. Tex. Feb. 25, 2010) (finding "that the Plaintiffs have established 'a good explanation' for delaying the filing of their request for preliminary relief" in trademark infringement case where plaintiffs first tried to negotiate the dispute with defendant before filing suit). Importantly, any alleged delay in seeking injunctive relief prejudices UATP, not Kangaroo who continues to benefit from its use of UATP's proprietary features and protected Trade Dress. *Daily Instruments*, 998 F. Supp. 2d at 571 (granting plaintiff's request for preliminary injunction and acknowledging that plaintiff "has a decent although not an ideal

explanation for its delay in seeking a preliminary injunction, but Defendants have suffered no prejudice as a result thereof").

The district court acknowledged Kangaroo's delay argument and appropriately determined this to be insufficient to rebut the presumption of irreparable harm. Appx002-003. UATP also provided good explanations for any alleged delay – explanations with which the district court agreed. *See* Appx003. For example, UATP was, in good faith, trying to work with Kangaroo and the other Defendants to obtain information responsive to its discovery requests so it could make the important determination of who owned the equipment – equipment previously used by AEG in operating its Urban Air franchise and currently unlawfully used by Kangaroo in operating Kangaroo Fun Zone – and what interrelationships between or among the parties existed. Appx002-003, Appx102-104, Appx172-174. Also around this time, according to Kangaroo, it "began making substantial modifications to its park." Opening Br. at 4-5 (citing Appx114, Appx116); *see* Appx003. Prior to seeking injunctive relief, and as a result of Defendants' failures to cooperate during discovery, UATP filed a Second Amended Complaint to ensure all persons and entities that could conceivably assert an ownership interest over the equipment in the McPherson Property were added as parties to the suit. *See* Appx456-491.

Kangaroo claims that because money damages can compensate UATP for any alleged harm, the district court erred in entering an injunction. Opening Br. at 26-27. Even if money damages are available, this does not mean money damages are an adequate remedy. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) ("[T]he mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'"). The Fifth Circuit has held that money damages are inadequate to compensate for continuing acts of infringement. *See, e.g., Abraham*, 708 F.3d at 627. More, Kangaroo has repeatedly implied it could not afford to pay any judgment for damages entered against it, further strengthening the inadequacy of monetary damages in this case. *See, e.g.,* Opening Br. at 1; Appx178, Appx709 at ¶¶ 3.14-15, Appx830, Appx833-834, Appx839 at ¶¶ 6-7; *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011) ("[T]he questionable financial condition of both [infringer] and its parent company reinforces the inadequacy of a remedy at law." "While competitive harms theoretically can be offset by monetary payments in certain circumstances, the likely availability of those monetary payments helps define the circumstances in which this is so."); *Canon, Inc. v. GCC Int'l Ltd.*, 263 Fed. Appx. 57, 62 (Fed. Cir. Jan. 25, 2008) (considering the improbability that the patentee could collect a money judgment as weighing in favor of an injunction).

### III. The district court balanced the equities and considered the public interest prior to granting the preliminary injunction.

The public interest factor overlaps substantially with the balance of the hardships requirement in deciding whether to grant an injunction. *Elepreneurs Holdings, LLC v. Benson*, 2021 LEXIS 21978, at *23 (E.D. Tex. Feb. 5, 2021). Kangaroo claims, "While the court stated '[i]t will balance the harm,' nothing in the preliminary injunction reveals how harm was balanced." Opening Br. at 27. Yet the sentence immediately preceding the line cited by Kangaroo represents exactly what Kangaroo claims is lacking – the court balancing the harm. *See* Appx003 ("The court does not seek to close Kangaroo's operations."). On the record, the district court repeatedly declared it did not want to shut anybody's operations down or put anyone out of business. Appx183.

By granting UATP an injunction, the scope of which is much narrower than requested, and by refusing to shut Kangaroo down, the court thoughtfully struck a delicate balance in protecting the rights and interests of UATP, Kangaroo, and the public. *Taco Cabana*, 932 F.2d at 1127 (holding district court has "considerable discretion in fashioning an appropriate remedy for infringement"); *Abraham*, 708 F.3d at 627 ("The district court did not abuse its discretion in crafting an injunction to balance the equities."); *Smith & Nephew, Inc. v. Arthrex, Inc.*, 2010 LEXIS 60356, at *9-10 (E.D. Tex. June 18, 2010) (The "touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between

protecting the patentee's rights and protecting the public from the injunction's adverse effects."); *compare* Appx628-630 *with* Appx003 at Sec. 3. Kangaroo explicitly recognizes this very balancing by the district court. Appx828 ("The Court conducted an evidentiary hearing on June 24, 2022, after which it entered the preliminary injunction, granting some of the relief UATP requested, but making it clear that the Court's intent was not for Kangaroo to have to close its operations.").

More, the threatened harm to UATP resulting from Kangaroo's unauthorized use of UATP's proprietary and protected features outweighs the threatened harm to Kangaroo. *Terex,* 2021 LEXIS 191168, at *41 (citing *TGI Friday's,* 652 F. Supp. 2d at 773)); *Ramada Franchise Sys. v. Jacobcart, Inc.*, 2001 LEXIS 6650, at *3 (N.D. Tex. May 17, 2001) ("[C]ourts usually hold that when defendants improperly use a plaintiff's trademark, the threatened harm to the plaintiff outweighs the threatened harm to the defendants."). Also, "'[t]he public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks.'" *T-Mobile US, Inc. v. Aio Wireless LLC*, 991 F. Supp. 2d 888, 929 (S.D. Tex. 2014) (quoting *Quantum Fitness Corp.*, 83 F. Supp. 2d at 832). Trademark law aims to "protect the public from deceit" and to protect "investment from its misappropriation by pirates and cheats." *Two Pesos,* 505 U.S. at 782 n. 15 (1992) (Steven, J. concurring). Certainly, the public has an interest in not being deceived. *See TGI Friday's,* 652 F. Supp.2d at 773 (stating that the public

also has an interest in not being deceived into believing that it is dining at a TGI Friday's restaurant that is no longer affiliated with TGIF and that is using TGIF's marks without authorization).

## IV. The district court did not abuse its discretion in deciding not to impose a bond.

Kangaroo briefly argues the district court abused its discretion by failing to require UATP to post a bond under Rule 65(c). Opening Br. at 27-28. While Rule 65(c) does require that a court "issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," the rule itself allows a court to provide the amount it "considers proper." FED. R. CIV. P 65(c). A court in the Fifth Circuit may therefore elect to require no security at all. *A.T.N. Indus., Inc. v. Gross*, 632 Fed. Appx. 185, 192 (5th Cir. Dec. 7, 2015) (holding district court did not abuse its discretion by not requiring a bond because a court is permitted to require no bond at all); *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (holding failure of the district court to compel the plaintiff to post a bond did not violate Rule 65(c) because the court may choose to require no bond at all).

Nonetheless, should the Court find the district court's failure to require a bond is reversible error (it should not), the Court should affirm the district court's entry of

the preliminary injunction and remand only the bond issue for proper calculation by the trial court.

## CONCLUSION

UATP asks the Court to affirm the district court's order granting a preliminary injunction and to grant it any additional relief, at law or in equity, to which it is entitled.

Respectfully submitted,

**BOYARMILLER**

By: */s/ Chris Hanslik*
Chris Hanslik
chanslik@boyarmiller.com
State Bar No. 00793895
Federal ID No. 19249
2925 Richmond Avenue
14th Floor
Houston, Texas 77098
Telephone: (713) 850-7766
Facsimile: (713) 552-1758

**Attorney for Plaintiffs-Appellees UATP, IP, LLC and UATP Management, LLC**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2022-2047

**Short Case Caption:** UATP IP, LLC v. Kangaroo, LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 8,857 words.

- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.

- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 08/24/2023

Signature: /s/ Chris Hanslik

Name: Chris Hanslik